UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
PECONIC BAYKEEPER, INC., KEVIN                          **MEMORANDUM OF**
MCALLISTER, ALFRED CHIOFOLO,                            **DECISION AND ORDER**
                                                        CV 04-4828 (ADS)
                        Plaintiffs,

                        - against -

SUFFOLK COUNTY, SUFFOLK COUNTY
DEPARTMENT OF PUBLIC WORKS,
DIVISION OF VECTOR CONTROL,

                        Defendants.
--------------------------------------------------------x

**A P P E A R A N C E S :**

**MATTHEW R. ATKINSON**
        Co-Counsel for the Plaintiffs
        206 Lincoln Street
        P.O. Box 1308
        Riverhead, New York 11901

**PACE ENVIRONMENTAL LITIGATION CLINIC**
        Co-Counsel for the Plaintiffs
        78 North Broadway
        White Plains, New York 10603
By:     Karl Stephen Coplan, Esq.
        Of Counsel

**CHRISTINE MALAFI**
        Suffolk County Attorney
        Counsel for the Defendants
        H. Lee Dennison Building
        100 Veterans memorial Highway
        Hauppauge, New York 11788
By:     Christopher A. Jeffreys, Assistant County Attorney
        Christopher M. Gatto, Assistant County Attorney

**SPATT, District Judge.**

Under the provisions of the Clean Water Act, it is unlawful to discharge "pollutants" in the waters of the United States without an appropriate permit. As stated by the Second Circuit in *No Spray Coalition, Inc., et al v. City of New York, et al.*, 351 F.3d 602, 604 (2d Cir. 2003): "The Clean Water Act is a regulatory statute designed to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The statute prohibits "discharge" of "any pollutant" into "navigable waters" without a permit issued by the United States Environmental Protection Agency ("USEPA" and "EPA") under the National Pollution Discharge Elimination System ("NPDES") or under a federally approved state permit system. *See* 33 U.S.C. §§ 1311(a), 1342. New York State created the "State Pollutant Discharge Elimination System" ("SPDES"), in compliance with the Clean Water Act. *See* N.Y.Envir.Conserv.Law § 17-0801 (McKinney 2006).

The Clean Water Act contains a "citizen suit" provision providing that any "person or persons having an interest which is or may be adversely affected" may sue to enforce any limitation in a Clean Water Act permit. 33 U.S.C. §§ 1365(a)(g); *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 174, 120 S. Ct. 693, 701, 145 L.Ed. 2d 610 (2000). This is such a citizen suit.

Further, the Clean Water Act contains two permitting provisions that form the basis of the plaintiffs' claims: (1) Section 402 relates to the "discharge of a pollutant," and (2) Section 404 relates to the discharge of "dredged or fil material." *See* 33 U.S.C. §§ 1342

and 1344.

## I. <u>PRIOR PROCEEDINGS</u>

This action was commenced against Suffolk County and Vector Control, a division of the Suffolk County Department of Public Works, by the filing of a complaint on November 8, 2004. As stated in the Introduction, "this action is a citizen suit" brought under Section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1) seeking civil penalties payable to the United States Treasury, injunctive relief, declaratory relief and costs including reasonable attorneys' fees. The complaint consists of three cause of action. The First Claim for Relief alleges violation of the Clean Water Act by "Discharging Dredged Spoils and other Materials Without a Clean Water Act Section 404 Permit." The Second Claim For Relief alleges violations of the Clean Water Act by "Discharging Pollutants from Ditches and Culverts Without a Clean Water Act Section 402 Permit." The Third Claim For Relief alleges violations of the Clean Water Act by "Spraying Pesticides into Waters of the United States Without a Clean Water Act Section 402 Permit."

In response to the plaintiffs motion for partial summary judgment and the defendants cross-motion for summary judgment dismissing the complaint, the Court rendered a decision on March 12, 2007. In the decision, the Court found that multiple material issues of fact exist which precludes summary judgment by either party. Accordingly, both motions for summary judgment were denied.

## II. <u>THE TRIAL</u>

In this case several unfamiliar terms were discussed, which require definition. For

example, a larvicide is defined as an agent for killing larval pests. Larva is the immature, wingless and often wormlike feeding forms that hatches from the eggs of many insects. An adulticide is an insecticide used to kill adult insects as opposed to a larvicide.

The plaintiff Alfred Chiofolo is a semi-retired bayman. He has clammed, fished and did crabbing on the south shore of Long Island for more than forty years. He testified that after Suffolk County sprayed over wetlands with pesticides, he saw "dead crabs all over" and also saw toad fish and other fish dead in the crab pots. His "catch" decreased about ten percent per year from 2000 and this affected him economically. Chiofolo saw unmarked helicopters every year, with Suffolk County trucks servicing them. He also saw crabs asleep in the mud and a dredge scooped them up . In 2005 he had chest surgery and other health problems and cannot work. Chiofolo would like to see the spraying stop and would want the County to use another method of mosquito control.

On cross-examination, Chiofolo testified that in his day, he was a very active crab fisherman. In 2001, he caught more than 100,000 pounds of crabs. In calendar year 2004, he caught more than 50,000 pounds of crabs. He became ill in 2005 and could no longer work as a fisherman. While he saw helicopters spraying in the Mastic area, he could not tell if they were spraying pesticides. In fact, he didn't know what was being sprayed. Also he did not test any of the dead crabs or the water they were in, nor was he aware of any such test results. Chiofolo was familiar with this type of litigation, because he was involved in four prior lawsuits brought by Peconic Baykeeper. In addition, although Chiofolo testified at a hearing before the Suffolk County Legislature opposing the County

Vector Control Program, he is aware of no studies finding that Vector Control has any negative impact on crabs, humans or the water; and, he has no knowledge of any documentation to support his "damage to crabs" theory.

The co-plaintiff, Kevin McAllister, has been the President, CEO and Chief Financial Officer of Peconic Baykeeper, Inc. ("PBK") from 2004. He first formed this organization in June, 2001. The mission of PBK is to protect and improve the south shore bays and advance conservation issues. PBK owns 280 acres of bay bottom, under the water in the Great Peconic Bay near Southampton; in part to be used for oyster cultivation and to raise shellfish.

As a person who employed crabbing and shell fishing for recreational purposes, he saw the impact of ditches and pesticides as a threat to aquatic life. McAllister discussed a New York State decision by Justice Paul J. Baisley, Jr. which found in favor of PBK.

McAllister investigated the so-called mosquito ditches himself. On March 31, 2004, he took several samples from a ditch located along the western flank of the Terrell River County Park, on the border of Center Moriches and East Moriches, near the waterfront on Moriches Bay. The samples were to ascertain if there was a conveyance of pollutants from the mosquito ditches to Moriches Bay. The results were all negative for pesticides and other compounds except for elevated levels of "total and fecal coliform bacteria". He explained that fecal coliform bacteria exists in the intestinal tract of warm-blooded animals and indicates the presence of "other pathogens that form public health threats."

McAllister returned to this same location some ten months later, in 2005, to take

additional samples. The results were elevated samples of bacteria and showed that water was flowing from the ditch to the bay. The lab that did this testing in 2005 was the Eco-Test Laboratories.

On cross-examination, McAllister revealed that PBK had initiated two prior suits against Suffolk County in 2002 and 2003. In fact, he challenged the County on four prior occasions. These cases involved the same plaintiffs and the same attorneys. He conceded that Vector Control by Suffolk County suppresses mosquito propagation for health reasons:

> Q    You don't dispute, sir, that the Suffolk County Division of Vector Control suppresses mosquitos and their propagation for health reasons?
>
> A    Correct.
>
> Q    So, there is a health overlying purpose for the county's vector control program; is that correct?
>
> A    Not entirely.
>
> Q    But that is one of the reasons, correct?
>
> A    Yes.
>
> Q    And isn't it true, sir, that one of the means that the Division of Vector Control utilizes to suppress mosquitos is by channeling and draining water in swampy areas to minimize mosquito breeding areas?
>
> A    Yes.

Tr. at 78-79.[*]

_____

[*]Tr. refers to the trial transcript.

McAllister previously testified before the Suffolk County Legislature that the application of pesticides from the Vector Control Program caused lobsters to die. However, on January 30, 2001, before the Legislature, he conceded that his statement as to the lobsters dying because of the Vector Control Program was "speculative." ( Tr. at 87).

In addition, McAllister testified many times before the Suffolk County Legislature Health Committee – always in opposition to the Vector Control Program. He testified that his lab reports confirmed that the fish kill at Priest's Pond on August 12, 2001 showed a high level of pyrethroid pesticides. However, in fact, he conceded that the state lab report was not conclusive and that is the same lab report he is relying on in this case. Also, in his testimony before the County Legislature he indicated that he wanted the County to do away with the mosquito ditches, even though it would take nearly seventy years for a mosquito ditch to fill in.

Also, since December 2004, he was aware that the New York State Department of Environmental Control ("DEC") had personal involvement in any Vector Control Project that requires maintenance of any mosquito ditch within Suffolk County. In addition, referring to his co-plaintiff Alfred Chiofolo, he considered his testimony concerning the decrease in crab population in Moriches Bay to be "merely speculative and anecdotal information." (Tr. at 90).

On August 12, 2001, McAllister received a call to investigate a fish kill in Priests Pond in Flanders. He stated that testing by the lab revealed high levels of pesticides called pyrethroid, resmethrin and piperonyl butoxide ("PBO"). He packed dead fish and shrimp

in ice and took them to a lab in Holbrook for a pesticide analysis. However, he did not ask the lab to investigate whether dissolved oxygen in very hot weather, at that time, was the reason the fish and shrimp died, even though this was the most common reasons for fish to die in a very hot period. Further, the director of the laboratory testified that he could not state with certainty that Scourge was the cause of the fish kill or shrimp kill. (Tr. at 108). In addition, for some reason, McAllister didn't request that the lab render a report as to the dead grass shrimp. Further, McAllister conceded that the dead juvenile flounders tested positive for DDT which was a pesticide banned for Suffolk County in the late 1960s and banned nationally in the 1970s; that DDT was fatal to animals, depending on its concentration; and there was no reason to believe that the County applied DDT. (Tr. at 115).

The plaintiffs' complaint alleges that the County of Suffolk violated the Clean Water Act by failing to have a New York State DEC permit referred to as a SPDES permit for some of the pesticides spraying activities. However, significantly, McAllister testified that the USEPA has, in the State of New York, delegated authority to issue any SPDES permit to the New York State DEC. McAllister testified that he was not aware that two representatives of the New York DEC, Vincent Palmer and John Pavacic both advised the County of Suffolk that a SPDES permit is not needed for its Vector Control activities.

With respect to the "fecal coliform bacteria" McAllister found in the mosquito ditches, he testified that this was a product of "animal poop" found in the wild area in the marshlands. Obviously, there are no rest areas for the animals to relieve themselves; and

so all through the year there was a natural process of animals excreting feces. According to McAllister, the fecal coliform bacteria would disperse naturally if there were no ditches and the flowing water could transport this material.

McAllister testified that he is opposed to only one particular larvicide called Altosid, which is methoprene, which, he says is deployed by helicopters over salt marshes. These Altosid products have to be applied in water or to areas that will become flooded and will work when the water reaches the product. Also, he stated that in the "bona fide presence of West Nile Virus, then we support surgical applications of pesticide to protect human health." However, PBK is opposed to "nuisance control, basically making peoples lives more comfortable in their backyards." (Tr. at 128).

Finally, McAllister commented on one of the key issues in this case; namely whether the County had permits to conduct its Vector Control activities, as follows:

Q     Sir, are you aware that the issue in this case concerns whether the county had appropriate permits to conduct its vector control activities concerning the applications of larvicides and adulticides? Are you aware of that?

A     Yes.

Q     So you are also aware, sir, that your objection to methoprene as a larvicide really has no involvement in this case if there was a permit issued for the use of methoprene?

\*   \*   \*   \*

THE WITNESS: Methoprene is not germane to this case.

BY MR. JEFFREYS:

Q       Are you aware that the county had permits for its use of methoprene
        in its vector control program?

A       Presumably so, yes.

Tr. at 134-135.

Dominick Ninivaggi is the supervisor of the Division of Vector Control in the Suffolk County Department of Public Works. As such, he is a key witness and was on the stand for several days. Formerly, he worked for the Army Corps of Engineers and as an oceanographer responsible for evaluating wetlands and dredging projects. In 1976 he started working for the New York State DEC and was responsible for managing 2,000 acres of tidal wetland properties. In his present position, he has overall oversight of the Vector Control mosquito control program engaged in aerial and truck spraying. He put the program together. He makes the decisions about where to apply adulticides. In the Vector Control program from 1999 to the present the adulticides he used included Scourge and Anvil. The label for Scourge states that this pesticide is highly toxic to fish and is for terrestrial uses; do not apply directly to water and drifts and runoff from treated sites may be hazardous to fish in adjacent water. It also says to avoid direct application to lakes, ponds and streams. The label for Anvil, which is also applied by truck and helicopter states: "For terrestrial uses, do not apply directly to water or to areas where surface water is present."

Suffolk County does not own any helicopters and uses a contractor, North Fork

Helicopter for pesticide application services. Vector Control prepares the maps indicating the area to be treated. Ninivaggi goes on pre-treatment helicopter trips to survey the spraying areas and designates the boundaries of the areas to be sprayed. Counsel for the plaintiffs reviewed a number of photographs and exhibits with Ninivaggi showing where the spraying zones were located, including areas known as Unchachogue Creek and Johns Neck Creek. Ninivaggi also pointed out that there were exclusion zones "for label compliance or at the request of the national park service." (Tr. at 348).

Ninivaggi testified that the helicopters typically fly approximately 150 feet above ground level when they delivered the pesticide. The mosquitos can range from ground level to the height of the forest canopy and sometimes slightly above that level. As to the aircraft, they attempt to cover a 300 foot swath. However, when the spray cloud is released from the aircraft the size of the swath varies. Also, starting in 1999, Vector Control used three trucks to apply Scourge. Most of the applications were done by truck. Ninivaggi also related that the areas in central, northern and western parts of Suffolk county rarely have mosquitos. In terms of number of mosquitos, the biggest problem is along the south shore of Long Island, particularly in the Mastic-Shirley area, which is heavily populated and "has massive numbers of mosquitos." (Tr. at 394). Vector Control had a number of truck applications in that area during the summer in addition to helicopter applications.

Vector Control issues annual reports as to its activities. These reports are voluminous. The report for the year 2001 is some 3,750 pages.

As to the "ditching" control measures, Ninivaggi referred to the construction of new

ditches in the wetland. Most of the ditches were constructed in the 1930s by hand, and generally were two feet wide and about two feet deep in a parallel grid pattern out into the marshes. The purpose of the ditches originally was to reduce mosquito production both by draining off surface water and by introducing fish into the areas where mosquitos would breed. These small native fish such as killies, are very efficient predators and would eat the mosquito larvae. In addition, Vector Control does maintenance of the ditches by hand. Defendants' Exhibit G13 is a map, prepared by Vector Control, containing small red triangles, which represent breeding sites of mosquitos. Of course, not all breeding sites are on the map.

Ninivaggi testified that in or about February 28, 2000, a notice of violation was issued in the William Floyd Estate project, involving an error on the part of the crew in clearing some existing ditches and the construction of new mosquito ditching. On September 26, 2001, another notice of violation was issued from NYDEC to Vector Control with regard to a spray event in Flanders which occurred on August 7, 2001. The notice of violation charged that a swath of pesticide extended into and over the surface waters, which were located within 41 feet of the road. After receiving the notice of violation, Ninivaggi visited the area.

In evidence is a "State of the County" address by Suffolk County Executive Steve Levy on January 24, 2005, in which he announced that machine ditching helped to destroy many of the wetlands, and, in 2005 there will be no machine ditching in any wetlands in Suffolk County.

It was also revealed that Suffolk County did not receive a State Pollution Discharge Elimination System (SPDES) permit between 1999 and 2005. Nor did the County obtain an Army Corps of Engineers Section 404 permit. However, the work done at the William Floyd Estate was a wetlands restoration project done pursuant to an individual permit from the New York State DEC and subject to an Army Corps of Engineers Nationwide Permit for wetlands restoration. (See Plaintiffs' Exh. 82A).

In a lengthy cross-examination by defense counsel, Ninivaggi testified in detail with regard to twenty-five permits received by Vector Control. During his testimony, a series of permits were introduced in evidence. These permits are listed in the following manner:

(1) July 6, 2004 - DEC Permit No. 1-4700-00007-00024

Description of Authorized Activity:

General Permit for the following activities:

1) Repair and/or in kind, in place replacement of existing culverts, tide gates, tide boxes and other water control structures. 2) In kind, in place repair or reconstruction of mosquito control ditches (up to a total of 400,000 feet/year to within 6 inches of their original depth and width).
This permit does not authorize any new ditches or water control structures. Prior to the start of any specific project, the County will submit site specific project information to NYSDEC for review and approval. No application of pesticides is included in this project. (Defendants' Exh. F2).

(2) DEC Permit June 17, 2000 to October 15, 2010 No. 1-4700-00007/00007

Description of Authorized Activity:

Apply the following larvicides: Altosid Liquid Larvicide EPA Reg# 2724-392, Altosid Liquid Concentrate EPA #2724-446, Altosid pellets EPA #2724-448-64833, Altosid XR Briquets EPA #2724-421, Altosid XR-G EPA #2724-451, Vectobac CG EPA #275-70, Vectobac 12AS EPA #275-

102, Bti Briquets EPA #6218-47, Vectolex CG EPA #275-77, and Vectolex WDG EPA #275-135, throughout Suffolk County in and adjacent to NYSDEC regulated freshwater wetlands, for the purpose of mosquito abatement.

(Defendants' Exh. EF).

The Court notes that this permit authorizes the application of a number of larvicides "throughout Suffolk County in and adjacent to NYDEC regulated freshwater wetlands, for the purpose of mosquito abatement." Also the Altosid referenced in the permit is methoprene.

(3) <u>DEC Permit - for April 20, 2003 Permit No. 1-4724-00985-00001</u>

The authorized activity is the removal and replacement of a drainage culvert pipe in a freshwater wetland.

Ninivaggi explained that this type of structure allows the proper flow of water; which prevents the mosquitos from breeding in that water. The free flow of water also allows fish and the wildlife in, which reduces the mosquito larvae and, again reduces the need to spray.

(Defendants' Exh. EI).

(4) <u>DEC Permit - July 8, 2003 to July 8, 2004 Permit No. 73-06256/00001</u>

The authorized activity is to replace a collapsed culvert under Old Country Road in Eastport. This was part of the water management plan to prevent mosquito infestations.

(Defendants' Exh. EO).

(5) <u>DEC Permit - November 25, 2003 to November 25, 2004 Permit No. 730-00743-00003</u>

The authorized activity is to replace and reroute a drainage pipe system at

14

the North Fork Preserve and install two "clean out structures."

(Defendants' Exh. ES1).

The Court notes that all of these plans and ventures were approved by the New York

State DEC and all the work was performed in accordance to the plans approved by DEC.

(6) The prior permit, Defendants' Exhibit ES1 was extended by an "<u>Amendment to

Permit" dated April 7, 2004</u>.  The expiration date was extended from November 25,

2004 to November 25, 2005.

(Defendants' Exh. ES2).

(7) <u>DEC Permit - July 15, 2004 to September 30, 2005.  Permit No. 1-4700-
00007/00037</u>

This permit involved the prior Gilgo trial site and the Mastic/Shirley Airspray Trial

Sites.  The location of the project is as follows:

> In the vicinity of the eastern end of the Jones Beach barrier island in the
> area of Gilgo Beach, Gilgo State Park, Oak Beach and Captree Island in the
> Town of Babylon and in the hamlets of Mastic and Shirley, generally in an
> area south of Montauk Highway from the Carmans River to the William
> Floyd Estate, Town of Brookhaven, Suffolk County, New York.

These areas are outlined on the maps entitled Gilgo Trial Site and Mastic/Shirley

Airspray Trial as well as in the 7/1/04 document entitled "Assessment of the Potential

Effects of Mosquito Spraying on Local Organisms - Caging Study - Saltwater Assessment"

and all of which are stamped NYSDEC-approved on 7/15/04.

In lay terms, this permit authorized the application of adulticides in wetland areas

in a situation where emergency authorization was not appropriate or necessary to study the

effects of pesticides on marine organisms and conduct a "caged fish study" as follows:

> Project Description: Application of mosquito adulticide and larvicide to assess potential effects on local organisms as part of the Suffolk County Vector Control and Wetlands Management Long Term Plan and GEIS. All work shall be in accordance with attached NYSDEC-stamped approved plans date-stamped 7/15/04. (The Department has determined that No Permit is Necessary for this project pursuant to the Tidal Wetlands Land Use Regulations.)

Annexed to this permit were maps showing areas to be sprayed by helicopters including lands owned by the State of New York, all approved by the DEC.

(Defendants' Exh. FB).

> (8) Article 15 Permit from NYDEC "To Use An Aquatic Pesticide". The date of treatment from May 7, 2004 through October 1, 2004. Permit No. 030504BC05.

The waters to be tested included large areas on the South Shore of Long Island and included 'Primary Mosquito Breeding Sites". The authorized chemicals was Zoecon Altosid, with 2.1% methoprene.

An Article 15 permit permits use of an aquatic pesticide that is intended to target a problem organism that lives in the water; namely, in this situation, a larval mosquito.

(Defendants' Exh. ET).

> (9) DEC Permit to use an Aquatic Pesticide - May 7, 2004 through October 1, 2004 Permit No. 021403BC11

The target species to be controlled is mosquito larvae. This permit authorizes Vector Control to use Zoecon Altosid pellets, a methoprene, as a mosquito growth regulator.

(Defendants' Exh. EW).

(10) <u>DEC Permit to use an aquatic pesticide.  May 7, 2004 through October 1, 2004 - Permit No. 030504BC01</u>

Also involving the use of Zoecon Altosid liquid larvicide mosquito growth regulator in large areas of Suffolk County.

(Defendants' Exh. EX).

(11) <u>DEC Permit to Use an Aquatic Pesticide - May 7, 2004 through October 1, 2004 - Permit No. 030504BC08</u>

This is another Article 15 permit to use an aquatic pesticide called Valent Biosciences Vectobac 12 AS.  Ninivaggi explained that Vectobac 12 AS is a liquid formula of the bacterial pesticide known also as Bti, which is utilized by Vector Control for mosquito control.  These pesticides are applied in a variety of ways.  By hand in catch basins and drainage areas to control the mosquitos who breed in those places.  By helicopter, at daytime, with a  liquid formula of Altosid and Bti over salt marshes and freshwater areas adjacent to salt marshes flying at a very low level of 10 to 20 feet.

(Defendants' Exh. EU).

(12) <u>DEC Permit to Use An Aquatic Pesticide - May 7, 2004 through October 1, 2004 - Permit No. 030504BC09</u>

This is another Article 15 permit to use the pesticide Valent Bioscience Vectolex CG.  This is a live bacterial product that is also used to control mosquito larvae.

(Defendants' Exh. EV).

(13) <u>DEC Permit to use an Aquatic Pesticide - May 7, 2004 through October 1, 2004.  Permit No. 030504BC06</u>

This Article 15 permit authorized the Use of Valent Biosciences Vectolex WSP.

This is another bacterial product used for controlling mosquito larvae, in a water-soluble powder. Both the Valent product and Bti are biological products that Suffolk County uses in its Vector Control program.

(Defendants' Exh. EY).

(14) <u>DEC Permit to Use an Aquatic Pesticide - May 7, 2004 through October 1, 2004. Permit No. 030504BC04</u>

This permit authorizes the use of the pesticide "Summit Bti Briquets".

(Defendants' Exh. EZ).

(15) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005. Permit No. 030705BC03</u>

This permit authorizes the use of the pesticide Zoecon Atosid Liquid Larvicide Concentrate, containing methoprene.

(Defendants' Exh. FE).

(16) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005. Permit No. 030705BC07</u>

This permit authorizes the use of the pesticide Valent Biosciences Vectobac CG biological larvicide granules.

(Defendants' Exh. FF).

(17) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005. Permit No. 030705BC01</u>

This permit authorizes the use of Zoecon Altosid Liquid Larvicide Mosquito Growth Regulator (EPA Reg. No. 2724-392).

(Defendants' Exh FG).

(18) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005.  Permit No. 030705BC02</u>

This permit authorizes the pesticide Zoecon Altosid XR-G (EPA Reg No. 2724-451).

All of the Altosid products are methoprene.

(Defendants' Exh. FH).

(19) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005.  Permit No. 030705BC04</u>

This permit authorizes the use of the pesticide Summit Bti Briquets (EPA Reg. No. 0218-47) for long term control of mosquitos.

(Defendants' Exh. FI).

(20) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005.  Permit No. 030705BC05</u>

This permit authorizes the use of "Zoecon Altosid XR Extended Residual Briquets" (EPA Reg No. 2724-421).

(Defendants' Exh. FJ).

(21) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005.  Permit No. 030705BC06</u>

This permit authorizes the use of the pesticide "Zoecon Altosid Pellets Mosquito Growth Regulator" (EPA Reg. No. 2724-448).

(Defendants' Exh. FK).

(22) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005.  Permit No. 030705BC08</u>

This permit authorizes the use of the pesticide "Valent Bioscience Vectobac 12AS" (EPA Reg No. 73049-38).

(Defendants' Exh. FL).

(23) <u>DEC Permit to Use an Aquatic Pesticide - May 10, 2005 through September 30, 2005.  Permit no. 030705BC09</u>

This permit authorizes the use of "Valent Biosciences Vectolex CG" (EPA Reg No. 73049-20).

(Defendants' Exh. FM).

(24) <u>DEC Permit under the Environmental Conservation Law.  October 8, 2003. Permit No. 1-4730-01203/00001</u>

This is a tidal wetland permit to replace a deteriorated culvert in Jamesport, as part of the Vector Control water management process.  In connection with this work, the County submitted plans and specifications to DEC, and the work was done in accordance with those plans and specifications.

(Defendants' Exh. ER).

(25) <u>DEC Permit under the Environmental Conservation Law.  July 5, 2004 to December 31, 2004.  Permit No. 1-4700-00007/00024</u>

This was an important general permit involving major water management activities in tidal wetland areas.

The description of the authorized activity is as follows:

General permit for the following activities:

1.) Repair and/or in kind, in pace replacement of existing culverts, tide gates, tide boxes and other water control structures.  2.) In kind, in place

repair or reconstruction of mosquito control ditches (up to a total of 400,000 feet/year) to within 6 inches of their original depth and width.

This permit does not authorize any new ditches or water control structures. Prior to the start of any specific project, the County will submit site specific project information to NYSDEC for review and approval. No application of pesticide is included in this project.

(Defendants' Exh. FQ).

Ninivaggi explained this general permit in lay terms:

This is what is called a general permit. It was a permit to allow certain types of activities subject to the division of vector control submitting individual plans for these individual activities. That is, instead of issuing an individual permit for each activity, because there are many similar activities that we were proposing to do, it was grouped into this general permit in order to basically reduce paperwork and assure overall review of the program. Insure. Part of the permit was that no activities could be done until plans could be submitted for the projects.

Tr. at 570.

Ninivaggi explained his duties in detail, including his responsibility for the overall conduct of the Vector Control program; environmental compliance; obtaining the appropriate permits; obtaining the appropriate equipment; and the selection of pesticide application equipment. This includes surveillance of mosquitos to determine where they are; their species; the larvae mosquitos in the water; and the adult mosquitos. He explained that mosquitos need water to breed and have a broad range of sites on Long Island in which to do so. Mosquitos are not strong swimmers and usually leave their larvae in stagnant bodies of water. Vector Control tries to reduce the areas where mosquitos breed and endeavors to eliminate stagnant water.

Vector Control also maintains existing water control structures such as ditches and culvert pipes in order to keep water flowing, which renders each body of water less suitable for mosquitos. When the water is circulating there will be predators such as killie fish that will eat the mosquito larvae.

The County uses biological and chemical agents in its Vector Control program, such as Bti, Vectolux and methoprene to kill mosquito larva. In this regard, Ninivaggi works together and has frequent interaction with the New York State DEC to obtain permits and license to apply pesticides and make sure that his people have proper training. DEC people accompany Vector Control employees in the field and conduct inspections to make sure Vector Control is in compliance with state regulations. In addition, Ninivaggi interacted with the USEPA on many occasions, in the field and on committees on which he has served. In the early years of the West Nile response in 2000 and 2001 the EPA took a very active role. Later, the pesticide regulation program was delegated by the EPA to the New York State DEC.

At the present time, Vector Control efforts are focused on mosquitos. This work includes a large surveillance effort to determine where the mosquitos are in relation to people. In addition there is ground spraying from units on the ground for both larval and adult mosquitos by special Vector Control trucks.

West Nile Virus is a  mosquito-born pathogen, first found in North America in 1999. It is a disease that is sometimes transferred to humans by biting mosquitos. While Ninivaggi was with the New York State DEC he became acquainted and educated with the

mosquito control program and the permitting process.  As Superintendent of Vector Control, Ninivaggi has to submit annual plans to the legislature with DEC oversight.  For example, the 2005 plan eliminated all EPA Class 1 and 2 pesticides and permitted only lower toxicity Class 3 and 4 products.  The plans are reviewed for approval under the State Environmental Quality Review Act or SEQRA.  In addition, input for the plans are solicited from various federal agencies such as the USEPA and the U.S. Fish and Wildlife Service and the Federal Center for Disease Control, especially with regard to dealing with West Nile Virus.

The primary pathogen that Ninivaggi has had to deal with over the years is West Nile Virus.  The most serious potential threat is a virus called Rift Valley Fever, RIFT, which is even more lethal than West Nile Virus.  Ninivaggi described the dangers involved in this disease:

> If this pathogen were introduced and successfully established in the United States, the estimates are it would be over $20 billion a year in damage.
>
> This again is a very serious pathogen in terms [that] it's far more lethal than West Nile Virus.  The primary vectors are salt marsh mosquitos, which are extremely abundant in Suffolk County.  And perhaps the worst feature of this virus, that unlike the viruses we currently deal with, Rift Valley Fever is transmitted from adult female mosquitos to their eggs, which means that when the larvae hatch, they are already infected with the virus, which greatly complicates any kind of control efforts.  Because, fortunately, the viruses we deal with now, the newly emerged mosquitos are not infected.
>
> The consensus from the world's leading experts that were there, it's not a matter of if one of these exotic pathogens appears in North America the issue is when.
>
> So we take – we're fortunate that we haven't seen these pathogens yet, but

> needless to say, we are concerned and we hope to be prepared, should they
> appear.

Tr. at 487-488.

Ninivaggi described the other vector-borne diseases that are present in Suffolk County. There are four pathogens or germs or agents that cause disease. The first is Eastern Equine Encephalitis or EEE, the most serious mosquito borne pathogen in Suffolk County. While rare, this disease has a very high fatality rate especially for high risk adults and children. The second mosquito-borne disease is malaria, which is also rare.

A New York State Public Health Threat confirms that there is an immediate threat of mosquito-borne disease based on findings in the County. Public Health Threats were issued for EEE in 1994 and 1996; malaria in 1999; and for West Nile Virus from 1999 through 2007.

On August 2, 2005, the New York State Deputy Commissioner of Public Health wrote to the Commissioner of the Suffolk County Department of Health Services concerning the threat of the West Nile Virus infection - Defendants' Exh. FO. This letter declared that, with regard to the West Nile Virus, "a public health threat based on current activity exists in Suffolk County:"

> The finding of West Nile Virus infection in a mosquito pool specimen on July 29, 2005, indicates that the West Nile Virus is present in Suffolk County. Accordingly, pursuant to the authority vested in me by the Public Health Law and the rules and regulations promulgated thereunder, including but not limited to 10 N.Y.C.R.R. § 44.50, I declare that a public health threat based on current activity exists in Suffolk County.

> This declaration enables the County to undertake public health activities to

control mosquito populations in accordance with the New York State West Nile Virus Response Plan. In the event that adulticiding is being evaluated, please carefully review and follow the criteria in the WNV Response Plan . . . .

Enhanced education, as well as larviciding activities should also be included as essential components of your mosquito control efforts. We stand ready to assist you in your decision-making process.

A copy of this declaration is also being transmitted to the Commissioner of the New York State Department of Environmental Conservation pursuant to Environmental Conservation Law Section 24-0701(5).

(Defendants' Exh. FO) (emphasis supplied).

Ninivaggi testified that, as a result of this West Nile Virus "Public Health Threat," Vector Control has stepped up its surveillance activities, identifying areas of higher risk and sending crews to look for mosquito sources and identify their species. Vector Control is required to provide public notification when there will be a ground or aerial spray. Vector Control has provided substantial and widespread notice of its spraying activities. It provides newspaper notices; notifies the media; posts on the county website; maintains a spray hotline; posts notices at park entrances; notifies school districts, county legislators, other local government officials; and distributes maps which are also posted on the county website. Also, there is a "no-spray" list if someone doesn't want Vector Control on their property; which can be overcome in the event of a disease threat and an aerial application.

As to spraying, the County only uses chemicals in its Vector Control program that are registered by the USEPA and New York State DEC. The labeling process is important in the Vector Control activities. The labeling process is designed to control the actual use

of the material by the user.  Ninivaggi described this labeling process in detail:

> The labeling process is designed to control the actual use of the material by the user.  The labels have to meet certain legal requirements in terms of the information that is provided on it.  It needs to have information about the product contained in the container.  It has to have information related to safe use of the product, such as whether personal protective gear, such as gloves or a mask, needs to be used.  There's information on environmental hazards.  There's information on exactly how to use the product.

> And the label has the force of federal and state law.  There is a saying in the industry that the label is the law.

Tr. at 498.

All the pesticides used by Vector Control have the appropriate labels.  Prior to spraying, weather conditions are taken into account.  Further, in certain weather conditions Vector Control may decide spraying is not appropriate.  For example, if windy, spraying may not be done.  Also, in the cool part of the season, perhaps in September, mosquitos may not be flying.  In addition, there is no spraying in areas where school children are nearby.

Ninivaggi explained the process that Vector Control goes through in order to obtain its New York State DEC permits, such as the ones in evidence.

> Q    Can you tell the Court in general - - we've been through a lot of permits this morning so far - - the process that the county's vector control program goes through in order to get its permits, such as the ones we've discussed so far this morning, from the New York State Department of Environmental Conservation?

> A    All permits involve an application process where we have to fill out certain forms that provide certain information.  Most of the permits require various types of maps.

26

> In the case of a pesticide permit, we also have to provide the labels for the products that we're going to use. That information is provided as required by the state DEC. They then review that information, both for sufficiency, legally, to issue the permit, and for technical reasons, to determine if it's appropriate to issue a permit under their laws and their standards for issuing permits.

Tr. at 564.

An important event occurred on August 23, 2005. On that date an Emergency Authorization was issued to Vector Control by the New York State DEC (Defendants' Exh. FN). This authorization permitted Vector Control to conduct an aerial-based application of the pesticide Scourge, using a helicopter, provided that every precaution was taken to prevent introduction of the pesticide into surface waters. The DEC made a finding "that an Emergency Exists." The DEC emergency authorization stated the basis for the emergency:

> There is currently an immediate threat to public health in the affected area. Suffolk County discovered isolations of West Nile Virus (WNV) in two samples of Culex spp. Mosquitoes collected in the spray area. One positive sample was obtained from a CDC light trap at Peconic Avenue in West Babylon (one positive out of two pools totaling 38 mosquitoes). The second positive sample was obtained from a gravid trap on Calhoun Street (one positive out of three pools totaling 129 mosquitoes). In addition, seven WNV-positive birds were collected from the spray area and represent half of the WNV-positive birds found in Suffolk County thus far this season. This cluster of birds represents a likely center of viral amplification. In addition, the area is densely populated by people increasing the potential risk of infection. This history indicates that viral activity detected this early in the season is likely to continue without intervention. The State Commissioner of Health subsequently declared a public health threat for West Nile Virus in Suffolk County on August 2, 2005. This has triggered the need to treat the affected areas. Aerial application has been selected because of the large areas involved and the lack of road access to all areas

that require treatment. Ground application is much less effective under those conditions.

Based on the Department's review of the situation and the information provided by Suffolk County and having consulted with the Department's Office of Natural Resources and Bureau of Pesticides, the Department has determined that this situation meets the definition of an emergency, "an event which presents an immediate threat to life, health, property, or natural resources," as defined in the Uniform Procedures regulations, Section 621.1(g). There is currently an immediate threat to human health due to the presence of West Nile Virus.

Accordingly, the Department hereby make a finding that an emergency exists pursuant to Section 621.12 of the Uniform Procedures Act regulations due to the threat noted above. The Department has determined that emergency action is necessary in order to protect human health.

(Defendants' Exh. FN) (emphasis supplied).

The Emergency Authorization further provided that spray jets would be turned off over visible lakes, parks, rivers, streams and other surface waters. Annexed to the Emergency Authorization was a map showing where the West Nile Virus was found and where mosquitos are likely to fly. A spray plan was created in accordance with this Emergency Authorization and was accomplished. (See Plaintiffs Exhs. 64 and 67).

Ninivaggi testified that after the presence of West Nile Virus was detected, the County had to seek additional emergency authorizations almost every year. These authorizations were all issued by the New York State DEC and permitted the application of adulticide to kill the infected adult mosquitos before they transmitted disease. There also were a number of other emergency authorizations for aerial application of mosquito adulticide to control West Nile Virus. The other emergency authorizations in evidence, are

as follows:

1.   August 4, 2000 - Letter giving emergency authorization to spray mosquito adulticide "to control West Nice Virus," "an event which presents an immediate threat to life, health, property natural resources" in the Belmont State Park area.  A finding made that "an emergency exists . . . due to the public health threat of West Nile Virus."   Vector Control was authorized to spray Anvil and Piperonyl Butoxide in accordance with label concentrations.  (Defendants' Exh. EG).

2.   August 9, 2001 - A DEC emergency authorization permitting the use of the pesticide Scourge (resmethrin) for the area north of Lake Ronkonkoma.  It was issued in regard to an emergency, "an event which presents an immediate threat to life, health, property or natural resources."  (Defendants' Exh. EJ).

3.   August 16, 2001 - A DEC emergency authorization for a thirty-day period, for aerial application as to West Nile Virus, in Nesconset, to conduct ground based application of the pesticide Scourge (resmethrin).  (Defendants' Exh. EK).

4.   August 23, 2002 - A DEC emergency authorization for a spray event in Huntington for aerial application of the pesticide Scourge (resmethrin); with an annexed spray map showing an authorized treatment area.  A spray event was conducted in Huntington pursuant to this emergency authorization.  (Defendants' Exh. EL).

5.   August 23, 2002 - A DEC emergency authorization in the Town of Babylon as a "West Nile Virus Response" and authorizing the use of Scourge.  The treatment area boundary was approved by the DEC.  The County did apply adulticide from August 23,

2002 to September 23, 2002 in that location pursuant to this emergency authorization. (Defendants' Exh. EM).

6. September 20, 2002 - A DEC emergency authorization in the Towns of Islip and Brookhaven for the application of adulticide in response to West Nile Virus. The area treated encompassed the area shown on an area map entitled "Mosquito Control Treatment Zone" and is stamped "DEC approved" on September 20, 2002. However, this project was cancelled "because it was getting late in the season and the weather was poor." (Tr. at 600-601).

7. August 26, 2003 - A DEC emergency authorization. The area to be treated was in and surrounding Blydenburgh County Park in Smithtown. In that area Vector Control performed adulticide activities. New York State DEC was consulted on how to comply with the label restrictions of Scourge while still appropriately conducting the operation. As a result, certain no-spray zones were mapped out and agreed upon. In those no-spray areas, the pilot would cut off the spray in compliance with the label. In particular, there would be no spray over lakes, streams and ponds. The Court notes that on the last page of this emergency authorization there is a stamp which states "NYSDEC approved as per terms and conditions of Permit No. 1-4700-00007/00034 Dated August 26, 2003" and initialed. (Defendants' Exh. EN).

8. August 27, 2003 - A DEC emergency authorization for treatment for adult mosquitos in response to West Nile Virus reports in the town of Southhold. This was another New York State approved spray plan. This authorization included no-spray areas

that were open water in order to meet the Scourge label requirements. (Defendants' Exh. EQ1).

9. August 27, 2003 - A DEC emergency authorization in response to West Nile Virus. This involved the Mastic/Shirley aerial application within the boundary lines set forth in the map annexed to the authorization. This authorization was also stamped "approved" by the New York State DEC. (Defendants' Exh. EQ2).

10. August 25, 2004 - A DEC emergency authorization to apply pesticides by air in response to West Nile Virus for the Mastic/Shirley area. Vector Control discussed this operation with New York State DEC as to the area to be treated and the compliance with the label requirements of the chemicals. The authorization was stamped "approved" by DEC. (Defendants' Exh. FC).

In addition to the permits and emergency authorizations in evidence, the defendants introduced a "Special Use Permit" by the United States Department of the Interior, Fish and Wildlife Service (Defendants' Exh. FD). The permittee was the "Bureau of Vector Control." This permit allowed Vector Control to control larval mosquitos in two refuges in Suffolk County: the Wertheim National Wildlife Refuge in Shirley and the Seatuck National Wildlife Refuge in Islip.

Ninivaggi described the various permits in the Vector Control field by the United States and the State of New York, and, significantly, noted that permit authority in this field has been delegated by the United States to the State of New York, as follows:

Q        Mr. Ninivaggi, do you know what an NPDES or an SPDES permit

is?

A       An NPDES permit is a permit under the National Pollutant Discharge Elimination System, and it is a Clean Water Act permit under federal law.

SPDES is often called "speedy's," pronounced "speedy's" for short. It's a permit under State Pollutant Discharge Elimination system. That's a state permit issued under the Clean Water Act in states where that act has been delegated to state authority.

Q       Are you aware through your job responsibilities whether the USEPA has delegated that responsibility to the New York State Department of Environmental Conservation?

A       Yes, I am aware it has been delegated to the State of New York.

Q       And in the State of New York?

THE COURT: Excuse me. What was delegated to the State of New York?

THE WITNESS: Permit authority has been delegated to the State of New York.

BY MR. JEFFREYS:

Q       And in New York State, could you tell the Court what governmental agency administers SPDES permits?

A       It's the New York State Department of Environmental Conservation, or the New York DEC.

Tr. at 696-697.

Ninivaggi testified that he speaks to New York State DEC personnel regularly and asks them for their advice on many matters, including "how to interpret a pesticide label" and other environmental conservation legal matters. DEC responds to his inquiries and he

incorporates its advice in his Vector Control activities. He also testified that Vector Control relied on the determinations of DEC that there was no requirement for a SPDES Permit. However, in 2005, Vector Control again inquired of New York State DEC as to whether a SPDES Permit was required for the Suffolk County activities.

FIFRA is the primary federal law regarding the use of pesticides. The acronym is short for the Federal Insecticide Fungicide and Rodenticide Act, 7 U.S.C. § 135 *et seq.* (1970). All of the pesticides utilized by Vector Control have instructions on their labels concerning their use, pursuant to FIFRA. These instructions are issued by both USEPA and DEC. These label instructions are written in precise language. There are industry handbooks and other materials used in the industry to interpret the specific language in the pesticide labels. Ninivaggi has a copy of the USEPA label manual, which Vector Control uses. All of these labels were approved by the New York State DEC.

Beginning in 2004 and thereafter, Vector Control used the pesticides Scourge and Anvil for control of adult mosquitos in "ultra low volume application." It also used a small amount of a product called Suspend SC, which is applied to vegetation in upland areas to kill mosquitos resting on the vegetation. In 2003 or earlier, Vector Control also used a chemical called malathion.

Ninivaggi defined the term "terrestrial use," as where the pesticide is applied to the soil or ground or vegetation directly in order to target pests on the ground or in the vegetation. The "ultra low volume" application of materials by Vector Control "is specifically not a terrestrial use." (Tr. at 725). So that label precautions that apply to

33

terrestrial use do not apply to the manner in which Scourge and Anvil are used by Vector

Control. Ninivaggi offered a further explanation of terrestrial use as opposed to Vector

Control "ultra low volume" application, which involves "tiny" amounts:

> "Terrestrial use" is a general term that applies to things like agriculture. For instance, where you say caterpillars are terrestrial animals that live on the vegetation, and you trying to kill, say, the caterpillars, so you are applying the pesticide directly to the vegetation.

> It is distinctly different from ultra low volume mosquito control, where the target organism is up in the air and you are applying organisms that are flying in the air as opposed to an insect that is on the ground.

> As a matter of fact, when you apply ultra low volume mosquito control pesticides, it's known that the application will have little or no effect on mosquitos that are not flying at the time of the treatment.

> THE COURT: It must be me. I still don't understand what terrestrial use means.

> MR. JEFFREYS: Your Honor, I'll go into a little more detail with the witness. We should be able to hone in a little more for you.

BY MR. JEFFREYS:

Q    The manner in which ultra low volume pesticides, Scourge and Anvil, are applied, can you tell the Court in some detail that [what] you know of the manner in which they are applied?

A    The exact equipment varies, but what they all have in common is that they produce a very small droplet of the pesticide, which is designed to stay up in the air and produce an aerosol or a mist or a fog. And ultra low volume means that the volume, the amount of the material that is put out, is very, very small.

In the case of Scourge and Anvil, the total volume of liquid put out into this aerosol is six-tenths of an ounce per acre. So it's a very, very tiny amount of pesticide per acre. And the reason we can do that is because the pesticide is concentrated, and it has these drops

that stay in the air, and the mosquitos encounter it.

It's very different from – for instance, there are mosquito control products that are designed to kill mosquitos that are resting in the vegetation.  <u>And the dose of pesticide for that use is about 64 times the dose that we use of the material for when we are trying to kill the mosquitos up in the air</u>.

Q    Now, you told us something about an aerosol mist or fog?

A    Yes.

Q    That's how ultra low volume pesticides, Scourge and Anvil, are applied by the division of vector control?

A    Yes.

Q    And is that applied down, facing towards the ground?  Is it applied in the air?  In water?

Where is it applied?

A    If it's a truck-mounted system, what the machine does, it generates these very fine droplets, and it has a system for blasting those droplets up into the air to form this cloud.  And there are various different means, but they all blast the material up in the air.  And you want the material up in the air, because that's where the flying mosquitos are.  You want it not to settle down on the ground.

For aerial application, the drops are generated by the aircraft.  And it is the speed and the flow past the air drop that generate the cloud of droplets.  The droplets basically come to the ground by a combination of mixing from the air flow around the aircraft, plus mixing in the air.  As the air circulates, it mixes, and it brings this cloud down to the ground.

There's very little, if any, gravitation settling.  The drops are so small that for all practical purposes, gravity doesn't affect them.  They basically move whichever way the air currents and turbulence bring.

So it's different if you are targeting organisms on the ground. In that case you use large drops, and you direct the treatment, the spray, down onto the ground to get the stuff on the ground as much as you can and as little as possible into the air. So it's kind of the opposite of what people generally think of when they think of spraying pesticide.

Q     So Mr. Ninivaggi, when you tell us about the ultra low volume aerosol mist and fog, in your experience with vector control is that a terrestrial use?

A     No, it's not.

Q     Why not?

A     It's basically intended to target an organism up in the air, while terrestrial use, you are targeting an organism that is on the ground or on the vegetation. In the case of a terrestrial use, you are trying to put the drops down onto the ground or down onto the grass or other vegetation, while on mosquito control ultra low volume use, you are trying to put the pesticide up in the air and the droplets up into the air to kill a flying insect.

Tr. at 726-729 (emphasis supplied).

As stated above, Vector Control does not own a helicopter. The County has a contract with the North Fork Helicopters to apply adulticide when there is a need. (Defendants' Exh. FT). Included in the contract are provisions that the applications are to conform to the labels on the pesticides and the equipment is to be shut off while flying over lakes, ponds, streams and bays. Also, applications are not to be made in wetland areas designated by the DEC.

Ninivaggi also described ditch maintenance. The purpose of these ditches is to control mosquitos by either draining off surface water where mosquitos breed or providing

a habitat for fish that eat mosquito larvae. The ditches were originally constructed in the 1930s. At that time, Suffolk County had several hundred cases of malaria, and it was believed that by installing ditches, it would greatly reduce the number of mosquitos. Ninivaggi described the ditches as "mostly long, straight ditches in the marsh. Typically, they are about two feet wide, plus or minus, and about two feet deep." (Tr. at 735-736). As they have over the years, today, according to Ninivaggi, the ditches do provide some mosquito control. Vector Control has maintained some of the ditches, based on site-specific considerations, by field crews.

As to Napeague Meadows, there are probably hundreds of grid ditches running, possibly for several miles, as they are shown, running in horizontal and vertical lines on the aerial photographs in evidence. No new ditches have been constructed in Napeague Meadows since 1994, but the existing mosquito ditches have been maintained so as to provide fish to eat the larvae. Vector Control advises DEC of the monthly ditching activities and follows advice from the DEC as to the proper manner to maintain the seventy year old grid ditch network.

In 1990, Ninivaggi was employed by the New York State DEC. On August 13, 1990, he authored an opinion for the DEC that was sent to the Suffolk County Department of Health Services, Bureau of Vector Control (Defendants' Exh. FP), which reads, in part, as follows:

> In response to the recent inquiry you made of Dominick Ninivaggi regarding the regulatory status of mosquito ditch maintenance in tidal wetlands, I can pass on to you the guidance I recently gave to Bureau and

Regional regulatory staff.  <u>Basically, no Tidal Wetlands (Article 25) permit is necessary for the ordinary maintenance of mosquito ditches on tidal wetlands</u>.  This includes all the necessary operations normally associated with maintenance. . . .

While no Article 25 permit is required for ditch maintenance, you should work with management staff (Dominick Ninivaggi) when determining which ditches on the State lands should be maintained.

\*   \*   \*   \*

I hope that this letter, which will become part of the Bureau file regarding mosquito control, clears up any misunderstandings regarding this matter. The Department has a responsibility to minimize the adverse impacts of mosquito control on tidal wetlands.  This goal will be accomplished through cooperative efforts with mosquito control agencies.  In particular, please feel free to contact me or my staff if you have any problems or questions regarding a particular project.

Sincerely,

/s/

Kenneth L. Koetzner
Chief, Bureau of Marine Habitat Protection

(Defendants' Exh. FP) (emphasis supplied).

The New York State DEC policy set forth in this letter has never been revised or revoked and still controls.  The County of Suffolk operates its ditch maintenance program in accordance with the guidelines set forth by the New York State DEC.  There have been no violations from DEC with regard to Vector Control ditch maintenance policies.

Ninivaggi also formerly worked with the U.S. Army Corps of Engineers and was familiar with its nationwide permitting process.  He testified that all of the ditch maintenance activities by the County of Suffolk since 2004 have been covered by the U.S.

Army Corps of Engineers Nationwide Permit No. 3.

On redirect examination of witness Ninivaggi, counsel for the plaintiffs emphasized that the emergency authorization instructed the helicopter pilots to turn off pesticide spray over surface waters. However, apparently, on a number of occasions, despite the general rule, Ninivaggi instructed the pilots to spray over certain creeks. The helicopter sprayed these creek areas at an altitude of 100 to 200 feet above ground level. Also, in Napeague Meadows, machinery used in cleaning the ditches spread material out alongside the ditch.

However, Ninivaggi testified that the helicopter pilots were instructed to turn off pesticide flow over surface waters to "avoid direct application over those areas." (Tr. at 785). The words "avoid direct application" is a term of art taken from the label of the pesticide Scourge. Vector Control complied with the label direction by turning off the jets when the aircraft were over lakes, ponds, rivers and streams and so they did not directly apply pesticides to water. The adulticide are applied "into the air, in the ultra low volume aerosol technique." (Tr. at 786).

Thomas Powell is the Director of EcoTest Laboratories located in North Babylon, New York and he operates an environmental testing lab. Reports of testing by EcoTest Laboratories are in evidence. Plaintiffs' Exh. 28B is a test report dated December 7, 2005, of a sample taken at the Terrell River County Park on November 30, 2005 by PBK of a mosquito ditch approximately 500 feet north of Smith Street. The result of this test is, first, total coliform, a type of bacteria, containing 1100 bacteria in a little under four ounces of water. The second test revealed fecal coliform, another type of bacteria with 500 bacteria

per four ounces of water.

Plaintiffs' Exhibit. 28C is a test done on November 30, 2005, also done in the Terrell River County Park and shows total coliform 300 and fecal coliform 200 readings, which was lower than in Plaintiffs' Exhibit 28B. Plaintiffs' Exhibit 28D is a test done on the same date in Terrell River County Park, but in the mosquito ditch culvert in Moriches Bay. In this test the total coliform was 5000 and the fecal coliform was 80. The fourth and final test was done on the same date in Moriches Bay, approximately 500 yards offshore (Plaintiffs' Exh. 28E) revealed the lowest amounts of bacteria. The coliform was 20 and the fecal coliform was less than 20.

On cross examination of Powell, it was revealed that the chain of custody form is in the handwriting of the plaintiff Kevin McAllister and that Powell has no knowledge of its accuracy. Also, the client, McAllister, collected the samples. Further, Powell does not know the manner in which McAllister collected the samples or preserved the samples. In addition, Powell does not know what the "normal fecal coliform bacteria" is in the Suffolk County wetlands. His laboratory just tested the samples that McAllister brought in to them.

> Q    So did you test anything from the wetlands themselves or just what Mr. McAllister gave you from the discharge from ditches?
>
> A    We tested what Mr. McAllister brought in.
>
> Q    What I'm asking you specifically: The things that Mr. McAllister brought in, were any of them from Suffolk County's wetlands?
>
> A    I really don't know. I know they are from mosquito ditches.
>
> Q    And you can't tell this Court as you sit here today whether those

mosquito ditches were off in Moriches Bay, whether they were in the middle of wetlands; you just don't know?

A      That's true.

Tr. at 209.

Powell also testified that he did not know what the fecal coliform bacteria level was in the tide that runs in and out of Moriches Bay at the time he did his tests, nor did he try to determine that data. However, test number four in Moriches Bay was approximately 500 yards offshore.

Ralph Huddleston, Jr. is a Senior Vice President of Carpenter Environmental Associates, an environmental engineering and science firm located in Monroe, New York. His area of expertise is in wetlands and environmental impact assessment, as well as fish and animal studies. He testified that mosquito ditching "changes the overall system" (Tr. at 229), and changes the "water scheme" in that the ditched areas get flooded and drained twice a day with tides. He stated that ditches commonly expedite the delivery of pollutants and nutrients to the aquatic environment.

Huddleston testified that coliform bacteria is one of the pollutants added to the system from either human or wildlife sources. He is familiar with ultra low volume applications. Scourge is the primary pesticide used by Suffolk County in their mosquito control program. They also use Anvil and malathion. He described his understanding of an ultra low volume application:

Q      Could you describe the purpose of a ULV, ultra low volume, application, how it works?

A        Yes. ULV system basically is designed to distribute very small particles. We're talking in the range of typically, I think, what Scourge calls between 8 and 30 microns, which is equal to 8 to 30 millionths of a meter. So they are very, very small droplet particles. These are dispersed through pressure in nozzles. They are sprayed either by air or ground methodology to disperse with the wind over a certain designated area where the treatment is desired.

Q        So it creates a kind of fog?

A        A fog or an aerosol mist, typically.

Tr. at 234.

Huddleston also testified that 90 percent of the material becomes a fog or mist and the remaining 10 percent will be either too light or too heavy and the "smaller ones will probably stay suspended longer than the anticipated amounts." (Tr. at 236). A "swath" is the area where the pesticide fog is supposed to cover and fall. The recommended swath is 300 feet. Shown certain aerial photographs in evidence, Plaintiffs' Exhibits 19B and 19D, if the surface water was no more than 50 feet from the road, Huddleston testified that he "would anticipate the pesticide distribution being over the open water." (Tr. at 241). Also, he would anticipate "some of the material falling to the surface." (Tr. at 242).

On cross examination it was revealed that Huddleston's New York pesticide application license was not renewed since 1995. He testified that fecal coliform bacteria is a byproduct of animal and bird excrement. Also, the ditches in Suffolk County were created in the '30s and '40s and over the 70-plus years, a separate ecosystem was developed in the ditch system. If the ditches were now plugged, there would be a material change in the ecosystem that presently exists in the marshland. Further, Huddleston testified that grid

ditching was a popular mode of mosquito control in the 1930s and 1940s. Even today there are questions and debates concerning the effectiveness of grid ditching and there are two sides to the grid ditch method of operation. Huddleston also conceded that if the County had permits, his views as to ditches and ditch maintenance would be irrelevant.

Also, Huddleston testified that the purpose of Vector Control and the fog cloud of Scourge and Anvil is to kill adult mosquitos. In addition, he knew that Suffolk County has not used the pesticide malathion since 2004. Further, he has no report, record or any other documentation that Suffolk County deviated from the ultra low volume direction on the Scourge and Anvil labels.

Huddleston was retained by Peconic Baykeeper in 2002 in a New York State lawsuit against Suffolk County Vector Control. The Vector Control plan involved water management which includes the maintenance of ditches, culverts and other surfaces that drain off surface waters. In that regard, he was aware that there are more than 660 miles of mosquito control ditches, reservoirs and pipes in the County's grid ditch network. This plan also included control of mosquito larvae. He is also aware that the County used two larvicides, methoprene, sold under the brand name, Altosid, and Bti, in the mosquito control plan. In addition, Huddleston is aware that the County received permits from New York State DEC for the use of methoprene and Bti in its Vector Control programs. Also, he knows that both methoprene and Bti must be applied to water in order to be effective on mosquito larvae; that both labels authorize use of the product in water; and "it would be impossible to kill mosquito larvae if you don't apply a larvicide in water." (Tr. at 256).

Huddleston further testified that the Vector Control 2002 annual plan included the control of adult mosquitos. The evidence in this case is that the only two adulticides used by Vector Control are Scourge and Anvil. In addition, he testified that DEC, the Suffolk County Council on Environmental Liability and the Suffolk County Legislature all approved the County of Suffolk 2002 annual plan of Vector Control.

Huddleston was questioned about the so-called fish kill that occurred in Priest's Pond on August 12, 2001. Huddleston confirmed that there was no definitive determination as to why that fish kill occurred. He was also questioned about the DEC permits received by Suffolk County. He reviewed the 2005 permits, but did not review the 2002, 2003, 2004, 2006 and 2007 permits. He did not ask to see these permits because he assumed that the County had the appropriate permits. He also did not review the Army Corps of Engineers general permits. In addition, Huddleston conceded that he did not review the Clean Water Act Section 404 to determine whether any permits were even required for the County's maintenance of its 70-year plus grid ditch system.

Stephen Terrasciano is a hydrologist with the United States Geological Survey. A hydrologist is a scientist who studies water through the atmosphere, into the ground and ultimately back into the atmosphere. He collects water samples to determine the quality of the water and to test for pesticides. In 2001 he took about 100 water samples in Suffolk County in areas where mosquito insecticides were being applied.

On August 7, 2001, following posted plans on Ralph Avenue he witnessed a Vector Control truck spraying what he assumed to be insecticides in the area and he collected

samples.  He took two or three liters of water, packed the samples on ice and drove them to the laboratory in his office in Coram, where the samples were filtered, labeled and shipped for analysis to a Kansas laboratory.  Plaintiffs' Exhibit 43 is a report entitled "Concentration of Insecticides in Selected Surface Water Bodies in Suffolk County, New York, before and after mosquito spraying 2002 through 2004."  Page 4 of Exhibit 43 is a summary of results from 27 pesticide-sampling sites in Suffolk County, New York 2002-2004.  Page 11 of Exhibit 43 shows sites X and Y with lines pointing to one ditch closest to Unchachogue Creek.  The samples were tested for resmethrin, malathion and sumithrin.

The result of an August 25, 2004 sample for the chemical piperonyl butoxide ("PBO") was 16 nanograms per liter, or expressed otherwise, 16 parts per trillion.  The results of an August 18, 2004 sample was 59,800 nanograms per liter or parts per trillion for PBO, and 270 nanograms per liter or parts per trillion for resmethrin.  As time progressed, the amount of PBO declined.  Terrasciano explained that some of the samples were collected below the water surface and other samples were collected at or near the water surface.  He does not know if the differences in collection would affect the results.  For example, on August 18, 2004 he tested for resmethrin at 20:00 (8:00 PM) and detected 270 nanograms per liter.  Then one minute later at 20:01 (8:01 PM) it was below detection limits.  He explained that the second sample was collected below the water surface, not at the water surface as the first one was collected.

Terrasciano did not perform those tests in the field.  At the time, he was in the laboratory.

At site Y as shown on Exhibit 43, samples were taken on August 25, 2004 at 17:45 and 17:46 in which there were no detectable pesticides. However, at 19:40, approximately one-half hour after the spray event, there was 12 nanograms per liter of PBO. Additional samples were taken at 19:41 and 21:10 and there was 28 nanograms per liter. Also, on August 26, 2004 at 04:30, an additional sample was taken and tested positive for PBO at 113 nanograms per liter. In addition, at a site at Cedar Beach Creek in Bay View at site C on August 27, 2003, at 18:50, approximately 20 minutes after a spray event, PBO was discovered in a sample in the amount of 40 nanograms per liter. At site R at Pattersquash Creek at Mastic Beach, samples were taken on three different days, the first two samples were taken when trucks sprayed resmethrin and the third following a helicopter spray. One sample tested at 117 nanograms per liter; another at 12 nanograms per liter; a third at 5 nanograms per liter; and another at 8 nanograms per liter.

On August 26, 2003, at site Q, a station named Nissequogue River near Smithtown, a sample taken at 18:16 was negative for detectable concentration of pesticides. A second sample at 20:30, ten minutes after an aerial application, found a reported concentration for PBO at 153 nanograms per liter and for resmethrin at 6 nanograms per liter.

Also on August 26, 2003, at site Z, a station at Vail Pond at Smithtown, a "grab" sample, from a helicopter spraying, revealed resmethrin, and tested positive for PBO at a concentration of 774 nanograms per liter. On the same date at site O, New Mill Pond, near Hauppauge, the results were 20 nanograms of pesticide per liter. At site P, New Mill Pond near Smithtown, on the same date, five minutes later, the results were 691 nanograms of

pesticide per liter.

On August 19, 2002, at site U, at Spectacle Pond at Nesconset, a sample following a spray by helicopter revealed PBO concentrate of 343 nanograms per liter and a resmethrin concentrate of 21 nanograms per liter. On August 19, 2002, at site J, Gibbs Pond at Nesconset, a sample tested positive for PBO at 6910 nanograms per liter, and resmethrin at 76 nanograms per liter. Finally, on August 26, 2002, at site W, at True Creek South on Pine Lake at West Islip, there was a "grab" sample from a helicopter spray. The sample tested for PBO at 13,400 nanograms per liter, and for resmethrin at 293 nanograms per liter.

Terrasciano further stated that in order for him to testify at this trial, he had to receive permission from the Chief of Services, Eastern Region of the U.S. Geological Survey. However, his testimony was limited to the facts, procedures and findings concerning his scientific data. He was prohibited from providing any opinions about this data.

On cross-examination, Terrasciano testified that his last test was on August 29, 2004, and that was the last water sample he took. He also defined certain terms. Methoprene is a larvicide; sumithrin is the chemical name for the brand name known as Anvil; resmethrin is a brand name for Scourge; and PBO is piperonyl butoxide, which is a compound that is sprayed with resmethrin and sumithrin to enhance their effectiveness.

With regard to his report for the period 2002 through August 24, 2004 (Plaintiffs' Exh. 43), Vector Control provided documentation to him to assist him with regard to these spray events. This assistance by Vector Control was voluntary. Also, he spoke to Dominic

Ninivaggi at Vector Control and a representative of the Suffolk County Department of
Health with regard to this documentation and his research as to the 2002 to 2004 spraying.

Terrasciano also explained that nanograms per liter translated to parts per trillion.
He further explained that tiny measurement as follows:

Q    You also mentioned on your direct examination where we talk about
     the nanograms per liter, that translates to parts per trillion; is that
     correct?

A    Yes.

Q    And when you are talking about parts per trillion, what is the part
     that you are talking about?

A    Those would be the equivalent measures of the amount of the
     ingredient measured compared to the amount of water in the sample.

                          *    *    *    *

Q    How about this?  If you had one trillion particles of water –

A    Yes.

Q    – and one of them is something else, not water –

A    That's an equivalent, yes.  That's correct.

Q    Would that be one part per trillion?

A    Yes.

                          *    *    *    *

MR. JEFFREYS: Your Honor, there is a question before the witness.

THE COURT: What is the question?

MR. JEFFREYS: Would 6 nanograms per liter, which is in some of

the results he has in his report – it there any way he can tell us, other than using nanograms per liter or parts per trillion, what size amount of chemical we are talking about so I could get a better understanding how much that is.

And I don't think it calls for an opinion. I'm asking him how much it is.

THE COURT: Did you understand that question?

THE WITNESS: Yes, I did. I'm trying to recall some analogy that would be helpful, <u>like one drop of water in an Olympic swimming pool</u>, something that would have more meaning, and an analogy escapes me at the moment.

BY MR. JEFFREYS:

Q      Is it on a scale of something like a drop of water in an Olympic swimming pool? Is that like something we're talking about?

A      It's on a scale. I'd have to do some calculations to be sure.

Tr. at 314-315, 317 (emphasis supplied).

Terrasciano testified that the U.S. Geological Survey entered into a contract with the County of Suffolk incident to the County's long term Vector Control Plan. The contract provided for the Geological Survey to investigate the effects of pesticide applications. Also, he stated that the Geological Survey did not review the permits involving the Vector Control work and did not know what permits were issued by the USEPA, New York State DEC or Army Corps of Engineers concerning work performed by the County of Suffolk in its Vector Control program. Nor does the Geological Survey know whether the County has all of the permits that are required for it to conduct Vector Control activities.

Dr. Karl Szekielda is an oceanographer who is a research professor at the City

University of New York and a summer faculty member at the Naval Research Laboratory in Washington, D.C. He presently has a contract with Suffolk County "to work on the detection of harmful algae blooms in the Peconic Bay." (Tr. at 621). He has also been retained by PBK to analyze data and "to look into the wetlands and find either modification due to excavations or dredges of the marsh area in using aerial photography." (Tr. at 621). The Court finds that the testimony of Dr. Szekielda was confusing and somewhat contradictory.

Dr. Szekielda apparently transformed electrical data into photographic material (Plaintiffs' Exhs. 179A and 179B). He processed these photographs from the digital or electronic data he received from the U.S. Geological Survey and printed them out at City University. Plaintiffs' Exhibit 179A is a 1994 aerial photograph of the Napeague area, which are wetlands in the Town of East Hampton. The photograph had "false color images." Plaintiffs' Exhibit 179B is a 2001 aerial photograph of the Napeague area.

Dr. Szekielda pointed out various changes in the ditches shown in the photographs. He did so in a very unclear manner. Dr. Szekielda testified that a major ditch was either reworked or was a new ditch, between the 1994 and 2001 time frame; as follows:

Q    How would you generally characterize the difference? How would you say the 2001 aerial compares in terms of the condition of the ditch and the marsh with the 1994 aerial?

A    Well, first of all, I pointed out there was a very clearly recognizable ditch in the year 2001; whereas, in the 1994 photograph, we could not recognize the ditch in the same location (indicating).

The other part I think is important is that the whole area where we

were reworking on the ditches –

MR. ATKINSON: What are you referring to?

THE WITNESS: I'm referring to the whole area.

MR. ATKINSON: Which one?

THE WITNESS: I'm referring to the 2001 aerial coverage, where we see the tremendous impacts of tracks of heavy machinery. I don't know what machinery. But we see all the tracks all over the marsh areas, with concentration in the eastern part and the image on the left part.

To me, that indicates that substantial work has been done through the whole area, but particularly in areas that have actually a very clear indication of what I think is reworked ditch area, where we recognize very high contrast in the photograph (indicating).

Tr. at 636-637.

Dr. Szekielda concluded that "the ditch was overgrown and reworked after 1994." (Tr. at 639). Apparently, he testified that over the years he saw the reworking of old ditches and the formation of new ditches. Also, he noted the "tremendous impact of this area due to the machinery that is obviously used for the dredging operation." (Tr. at 649).

On cross-examination, it was revealed that Dr. Szekielda has never walked through the Sayville areas he has been describing, so that his testimony is based solely on his review of the aerial photographs. Also, the aerial photographs were taken by a plane at an altitude of about 10,000 feet. In addition, as part of his retention by the plaintiffs, he conceded that he "enhanced" the photographs by adding "false color" to them. (Tr. at 656-657). Further, Dr. Szekielda was shown a number of additional aerial photographs as of 1984, 1994, 1996, 2001 and 2004, and all of those photographs showed the grid ditch network in Napeague

51

Meadows.

Thomas Iwanejko is employed as a principal environmentalist by the Suffolk County Department of Public Works, Division of Vector Control. In an email exchange from Iwanejko to Dr. Bruce Rosemeyer of the New York State DEC dated September 5, 2001, Dr. Rosemeyer asked, "What's the swath width in the Electramist Unit? Is it 150 feet, 75 feet on each side?" Iwanejko responded, "The Electramist ULV is set for a theoretical 300' swath. Under ideal conditions, (little or no wind) one assumes it treats 150' on each side of the vehicle. Under actual field conditions the swath is dependent on wind speed and direction, plus the aerodynamics of the vehicle that the unit is placed on." Iwanejko explained that the Electramist ULV is a truck-mounted machine which is a fog-generating ultra low volume machine for adulticide for adult mosquito control. Under ideal conditions, with little or no wind, the instruction booklet for this machine assumes it treats 150 feet on each side of the vehicle. However, under actual field conditions, the swath is dependent on wind speed, direction and the aerodynamics of the vehicle the unit is placed on. The machine puts the product in the air column and the wind carries the product to the desired location to control the mosquitos.

This concluded the plaintiffs' case. The Court reserved decision as to the Rule 50 motions at the end of the plaintiffs' case.

In the defendants' case, their first witness was Vincent Palmer who is the DEC official who is the head of the pesticide control program for Suffolk County.

He is employed by the New York State DEC as a Pesticide Control Specialist III.

He manages Region One which encompasses Nassau and Suffolk Counties. In this position, Palmer regulates the manufacture, distribution, use, storage and disposal of pesticides. His agency has issued emergency authorizations when there is a significant health threat posed by a vector-borne disease, such as West Nile Virus. His agency has primary responsibility for enforcing compliance with the use directions on the pesticide labels, and assists in interpreting and clarifying such directions. In his position, Palmer has constant interaction with the Suffolk County Vector Control program.

The New York State DEC is the permitting authority for the issuance of SPDES permits. He has answered inquiries from Dominick Ninivaggi of Vector Control with regard to the SPDES permits. He responds to these inquiries from Ninivaggi by telephone, backed up with an email or letter. After the initial West Nile Virus incident, sometime in 2001, he was asked by Vector Control whether mosquito larvicide requires a SPDES permit. He responded that "a SPDES permit was not required if the pesticides are being used in accordance with label directions." (Tr. at 806) (Defendants' Exh. FR2).

On cross-examination, Palmer testified that the label for Scourge indicates that it is for terrestrial uses and prohibits the direct discharge of the pesticide into open water. However, Palmer also testified that the U.S. EPA has issued a clarification of label statement, which includes the use of the pesticide "to treat the air column over surface water." (Tr. at 810). He explained this further, as follows:

> Q      Mr. Palmer, you just told Mr. Atkinson about the treatment of the air column. Could you explain to the Court what you meant by the treatment of the air column?

A        Really, dating back to when West Nile Virus entered the area in 1999, there was lots of discussion about the need for chemicals to control mosquitos capable of carrying diseases such as West Nile Virus.

A lot of the discussion came into play regarding how these materials were intended to be used and how EPA intended them to be used. And their interpretation was that if you are using an adulticide like this in an ultra low volume dosage and delivery systems that were approved to apply these chemicals, that that was considered acceptable, because you are treating the air column over the water. There's no direct discharge into the waters.

EPA made a determination with the consideration that there would be minimal deposition of certain particles into the water, but there was a balance that had to be achieved with regard to protecting public health and protecting environmental quality.

Q        So is it fair to say, sir, that the application of the pesticides Scourge and Anvil that we've been speaking about in the ultra low volume over water, to address the air column where these mosquitos fly, is not in accordance with DEC's position, that is, not an application directly to water? Correct?

A        Correct.

Tr. at 820.

Ninivaggi inquired of Palmer as to whether a SPDES permit is required for Suffolk County's Vector Control Program. He made this inquiry orally and by email. On May 29, 2001, Ninivaggi inquired about a SPDES permit in the following email sent to Palmer at DEC:

From:        Ninivaggi, Dominick
Sent:        Tuesday, May 29, 2001 4:47 PM
To:        Pavacic, John; Palmer, Vincent
Cd:        Iwanejko, Tom
Subject:        SPDES permit

The issue has been raised recently in California as to whether mosquito larviciding requires a NPDES (or in our case, SPDES) permit. Do our Article 15 permits constitute a SPDES permit, since they are issued under Article 15? This is a new thing in other states, but I think we're already doing it.

(Defendants' Exh. FR1).

On June 1, 2001, Palmer responded to Ninivaggi's request by email, in a clear,

succinct message:

| | |
|---|---|
| From: | Vinny Palmer |
| Sent: | Friday, June 01, 2001 8:36 AM |
| To: | Dominick Ninivaggi, John Pavacic |
| Cc: | Tom Iwanejko |
| Subject: | Re: SPDES permit |

Dom,

In New York State, if a registered pesticide is being used in accordance with label directions, there is no need to obtain a NPDES (SPDES) Permit.

(Defendants' Exh. FR2).

Dr. Scott Campbell is the Lab Director of the arthropod-borne disease laboratory of the Suffolk County Department of Health Services, Division of Public Health. An arthropod is an invertebrate; in the context of this trial, it is a mosquito. Thus, his scientific research is in mosquito-borne diseases. Dr. Campbell was hired in 1995 by the County Health Department as an entomologist, which is a scientist that specializes in insects. As Lab Director he is in charge of looking at the infection rates of arthropods, primarily mosquitos, but also ticks that carry various pathogens. A mosquito is an insect capable of transmitting a variety of diseases, by bacteria or virus that causes human diseases. There

are approximately fifty different species of mosquitos in Suffolk County. He testified that mosquitos carry West Nile Virus, Eastern Equine Encephalitis Virus and the agent that causes malaria. In significant testimony, Dr. Campbell explained in detail about mosquitos, their breeding and the diseases that mosquitos carry:

Q    And you mentioned mosquitos carry disease. What diseases do mosquitos carry?

A    Mosquitos in Suffolk County have been found to carry West Nile Virus, eastern equine encephalitis virus, and the agent that causes – a protozoan that causes malaria.

Q    Doctor, where do mosquitos live?

A    There is a terrestrial form as well as the aquatic form. The juvenile stages are found in water, and the adult stages are terrestrial.

Q    Let's put it this way: Where do mosquitos breed?

A    Mosquitos breed in water.

Q    Where could mosquitos breed?

A    I've observed larval mosquitos breed in both fresh and saltwater environments as well as containers, buckets, things like that. They are left in people's yards.

Q    How many stages of life are there for a mosquito.

A    It begins as an egg, and the eggs are likely laid on top of the water, on the water surface, or on the surrounding areas the mud or some sort of a substrate that is influenced by a flooding event.

When it rains, the water level rises and goes over the eggs. Once the eggs are touched by water, they emerge. And there are four stages of larvae, 1 through 4.

The four larval – INSTAR, pupates P-U-P-A-T-E-S, into a pupa, and

that is a resting stage.  That is a developing adult.  The pupal tent breaks out and emerges an adult, either a female or a male.

Q    Doctor, in what stages of life do mosquitos live in water?

A    They turn in the larval stage or the pupal stage.

Q    When a larva becomes an adult, what happens?

A    They basically fly away from that body of water to mate and search for a meal.

Q    Do mosquitos fly before they are adults?

A    No.

THE COURT: Sorry, didn't hear the question.

BY MR. GATTO:

Q    Do mosquitos fly before they are adults?

A    No, they only fly when they are adults.  All the other stages are restricted to bodies of water.

Q    When a mosquito is an adult, how far can a mosquito fly?

A    In the literature, they are known to fly approximately 1 to 25 miles.

*    *    *    *

Q    Do all mosquitos bite?

A    Bite –

Q    How do they feed?

A    Only females bite humans.  The males don't feed on humans or animals.  But not all mosquitos feed on humans.

Q    Now, Doctor, you mentioned some diseases that mosquitos can

carry.  What is a disease vector?

A      A disease vector  – a vector is a term  – in this case is the insect or the arthropod that is capable of transmitting a disease.

Q      Aren't mosquitos disease vectors?

A      Yes.

Q      And what does that mean?

A      That they are capable of transmitting disease or pathogens capable of causing disease in humans.

Q      Can mosquitos carry West Nile Virus?

A      Yes.

Q      Can mosquitos carry malaria?

A      Yes.

Q      Can mosquitos carry eastern equine encephalitis?

       MR. COPLAN: Objection, your Honor.  Expert testimony.

       THE COURT: Overruled.

A      Yes.  And in fact, we've collected mosquitos in Suffolk County that have contained eastern equine encephalitis and West Nile encephalitis.

       MR. COPLAN: Your Honor, I move to strike beyond what is called for in a yes or no response.

       THE COURT: Motion granted.  Answer is not responsive.

BY MR. GATTO:

Q      How do mosquitos transmit disease?

MR. COPLAN: Objection, expert opinion.

THE COURT: Overruled.

A      The pathogen is found in the salivary glands. When the female mosquito feeds, it secretes saliva into the wound for a variety of processes. When the saliva enters the wound, it carries with it the virus that carries the disease, the West Nile – the West Nile Virus or the eastern equine encephalitis virus, if it's in the salivary glands.

Q      Where does the mosquito get the virus from?

MR. COPLAN: Calls for expert testimony. Objection.

THE COURT: Overruled.

A      These are found in birds. And when the mosquito feeds on birds that is viremic, it can pick up the virus and potentially transmit it to another bird or a human.

BY MR. GATTO:

Q      Are the diseases that you mentioned, malaria, West Nile Virus, and eastern equine encephalitis, potentially fatal in humans?

A      Yes.

Tr. at 327-333.

Dr. Campbell's laboratory conducts the surveillance that is used to direct the control efforts by Vector Control The laboratory conducts surveillance by putting out mosquito traps. The traps are deployed in the evening and collected the following morning. This is done from the end of May to October. In 2007, the laboratory collected more than 53,000 mosquitos in the traps throughout Suffolk County. The mosquitos were anesthetized, identified by species, posted by species and sent to Albany for viral testing. In Albany, the

mosquitos are tested.  Once a virus is identified in the mosquitos, his department and Vector

Control are alerted.  Then control measures are determined.

Dr. Campbell testified that, after a virus is identified he speaks directly with

Dominic Ninivaggi in Vector Control and the two departments work together to determine

the controls that are necessary and the areas involved.  Dr. Campbell described the kind of

controls that are available to Suffolk County:

> Q    What are some of the kinds of controls that Suffolk County can
>      take?
>
> A    Well, the first thing that is generally done by vector control, again
>      – well, Dominic's staff goes to that site to see if there is any
>      breeding areas, and if there are, the larvicide is treated – the larva is
>      treated to reduce any more mosquitos entering that ecosystem.  And
>      then we look at trap counts to see if adulticiding is warranted.
>
> Q    Let's pause about what you said about with regard to the larval
>      mosquitos.  Is there a name for that?
>
> A    The larvicide.  Name for what?  I'm sorry.
>
> Q    What is the name for killing mosquitos in a larval stage?
>
>      THE COURT: Larval?
>
>      MR. GATTO: L-A-R-V-A-L.
>
> A    There's two approaches.  The first one is water management.   If
>      there are areas where they are breeding – it could be an old boat that
>      someone left out there, and that could be drained or removed.  The
>      other approach is larviciding.  That's applying larvicides to the area
>      to prevent the larvae from emerging as adults.

Tr. at 337.

As to the illnesses noted by Dr. Campbell as Laboratory Director, he stated that in

1999, two ten-year old boys were ill with malaria. Also, as to Eastern Equine Encephalitis, there have been cases in five of the last fifteen years. As to West Nile Virus, "it's hundreds of findings of West Nile Virus." (Tr. at 339). Also, New York State has declared a public health threat every year since 2000. Questioned on cross-examination as to the exact number of cases of West Nile Virus in Suffolk County, Dr. Campbell replied that in 2006, there were two such cases and none in 2007.

John Pavacic is presently employed as Commissioner of the Suffolk County Department of Parks. In his prior employment he was the Regional Permit Administrator for the New York State DEC. In that capacity his job responsibilities were to oversee, manage and administer the uniform procedures for permits issued by the DEC in Nassau and Suffolk Counties. Pavacic explained that SPDES permits are issued for discharge of effluents (waste waters) into the waters of Long Island. The DEC is the permitting authority for the issuance of SPDES permits.

In his capacity as DEC Regional Permits Administrator he responded to inquiries from the Suffolk County Vector Control, and, in particular, from Superintendent Dominic Ninivaggi. Some of these inquiries concerned the need for a SPDES permit with regard to the Vector Control aerial adulticide efforts. An email from Pavacic to Ninivaggi, dated August 12, 2005 (Defendants' Exh. FS), confirming the position of the New York State DEC, reads as follows:

Subject: Re: Emergency authorization

No, not an oversight. DEC has never required a SPDES permit for aerial

adulticiding. We have relied upon the fact that the pesticide is covered by FIFRA and is being applied in accordance with label instructions and the EPA policy memo which indicates that because the pesticide is being applied directly to the air column to target adult mosquitoes in flight, the pesticide is not being applied directly to surface waters and therefore is not a direct discharge. As a result we have determined that no SPDES permit is required.

So that it is clear that the New York State DEC has never required a SPDES permit for aerial adulticiding.

At this juncture, Dominic Ninivaggi was recalled and questioned with regard to the testimony of Palmer and Pavacic to the effect that a SPDES permit was not required for the Vector Control adulticide activities, if used in accordance with the label directions. Ninivaggi testified that he relied on these statements by the DEC officials in formulating his Vector Control program. In addition, Ninivaggi formulated a position "that if a registered pesticide is being used in accordance with label directions, we would not need to obtain a SPDES permit." (Tr. at 820).

Dr. David G. Graham is a physician licensed to practice medicine in the State of New York for approximately 28 years. He is employed by the Suffolk County Department of Health Services and is Director of Public Health and Chief Deputy Health Commissioner. His major responsibility is to prevent diseases that effect the general population, including diseases that are transmitted to people by mosquitos.

Asked to explain the nature of West Nile Virus, Dr. Graham responded:

Q        Doctor, can you define for us what West Nile Virus is?

A        West Nile Virus is a very common mosquito-borne disease, B-O-R-

N-E, disease. It is the most common arthropod disease, or mosquito-borne disease, in the United States today.

THE COURT: What was that word you used?

THE WITNESS: Mosquito-borne disease, which is a disease transmitted by mosquitos by (bite?).

THE COURT: You used another word.

THE WITNESS: Most common arthropod.

THE COURT: How do you spell that?

THE WITNESS: A-R-T-H-R-O-P-O-D.

THE COURT: What does that mean?

THE WITNESS: That means insects such as mosquitos and other species, like ticks. It would include mosquitos that transmit diseases to humans, such as West Nile disease, malaria and many others.

West Nile disease, as I was saying, is the most common mosquito-borne disease now in the United States. Since 1999 when it first became apparent in the western hemisphere, we've had now over 30,000 cumulative cases in humans since that time, with over 1,000 deaths from West Nile disease.

It is a disease that has now become very common and apparent throughout the continental United States and has an increase – becoming an increased and growing threat to the population here in the country.

Tr. at 824-825.

West Nile Virus was first detected in Suffolk County in 2000, as was published in a medical journal. Since 2001, Suffolk County has now had 30 cases of mosquito-transmitted disease, primarily West Nile Virus. Of those 30 cases, there have been four human deaths.

Dr. Graham also defined malaria:

> Q     Doctor, you mentioned another disease: malaria.
>
> A     That is correct.
>
> Q     Can you define that?
>
> A     Malaria is the world's most common transmitted disease. Estimates by the World Health Organization indicate that there are between three hundred and fine hundred million cases of clinical disease from malaria in the world, with over 1.3 million deaths each and every year, primarily affecting children, pregnant women and the elderly.
>
> It is the most common mosquito-borne and devastating disease in the world. We've had local cases of malaria in 1999 in which we've had two cases in ten-year-old boys here in Suffolk County. They were seriously ill. They were hospitalized. Fortunately, they recovered.
>
> But these were the first indications of malaria identified and documented here in Suffolk County.
>
> In the prior 75 years, we have never documented the presence of mosquito-borne diseases, prior to 1993.

Tr. at 825-826.

Dr. Graham also explained about the nature of the disease known as eastern equine encephalitis:

> Q     Doctor, what is eastern equine encephalitis?
>
> A     Eastern equine encephalitis disease is a very rare and life-threatening illness that we see in certain regions of the country and elsewhere. It is a rare disease, and by that I mean there are usually less than ten cases annually in the United States. But each and every case is critical in those affected by it.

What is noteworthy is the fact that anywhere from 50 to 70 percent of those clinical cases of eastern equine encephalitis virus, disease, also known as EEE, triple E – what is noteworthy is the fact that 50 to 70 percent of those cases are fatal. So if there were ten cases in the United States – and we had seven, for example, last year in New Hampshire alone – we can expect to see five to seven cases out of ten die directly from the viral infection which is transmitted by infected mosquitos.

Tr. at 827-828.

A "public health threat" is a disease or condition which threatens the public's health. As described by Dr. Graham, a public health threat is declared by the local health department and must be approved by the Commissioner of Health of the State of New York. Dr. Graham has been the primary author of these declarations requesting a public health threat. Significantly, in the last 13 years Suffolk County has had 10 years in which public health threats were declared because of the presence of diseases which are transmitted by mosquitos, like West Nile Virus or Eastern Equine Encephalitis.

Dr. Graham explained that Suffolk County has a very active surveillance program to try to detect the presence of these mosquito-borne diseases. His department collects data to try to identify, as quickly as possible, the presence of these diseases "which are potential threats to the health of the public." (Tr. at 829). In this regard, the County works directly with the New York State Laboratory called Wadsworth to test the specimens. Dr. Graham testified as to public health threats that were declared in Suffolk County "in 1994, in 1996, in 1999, in 2000, in 2001, in 2002, in 2003, in 2004, in 2005 and in 2006. Ten times in the last thirteen years." (Tr. at 831). As to the reasons for these declarations, Dr. Graham

stated:

> Q Doctor, what was the reason for the declarations of a public health threat in those years?

> A The reason for the declaration of a public health threat in Suffolk County during those years that I just mentioned was the presence and detection of West Nile Virus or disease, or eastern equine encephalitis virus.

Tr. at 832.

On cross-examination, Dr. Graham testified that mosquito-borne diseases, and in particular, West Nile Virus, malaria and Eastern Equine Encephalitis viruses have been detected in Suffolk County ten times in the last thirteen years. None were detected in the prior seven years. That is an indication of "prima facie evidence of a continued and growing threat of mosquito-borne disease presence, or their pathogens, in Suffolk County." (Tr. at 832). He stated that 2002 and 2003 were peak years with eight cases of West Nile Virus in 2002 and ten cases in 2003, with four deaths of previously healthy people. However, there were no deaths from West Nile Virus since 2003. Also, there has never been a human case of Eastern Equine Encephalitis in Suffolk County and no malaria case since 1999.

This concluded the testimony in this non-jury trial.

### III. DISCUSSION

### A. <u>The Plaintiffs' Causes of Action</u>

The complaint alleges three causes of action. The first claim for relief is based on violations of Section 301 of the Clean Water Act by discharging dredged spoils and other

materials without a Clean Water Act Section 404 permit. The second claim for relief is based on violations of Section 301 of the Clean Water Act by discharging pollutants from ditches and culverts without a Clean Water Act Section 402 permit. The third and final claim for relief alleges violations of Section 301 of the Clean Water Act by spraying pesticides into waters of the United States without a Clean Water Act Section 402 permit.

**B.** **Background**

The Court previously reviewed the background in this case in its March 12, 2007 decision in which it denied summary judgment to both sides. It is again necessary to review this material.

The plaintiff PBK is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business at 206 Lincoln Avenue, Riverhead, New York. The organization's stated mission is "to protect and improve the aquatic ecosystems of the Peconic and South Shore estuary systems of Long Island by, among other things, acting to safeguard and enhance sustainable commercial, recreational and subsistence uses of these estuary systems and their watersheds." PBK's members are residents of Long Island who live near the Peconic and South Shore estuary systems and use the waters and wetlands to fish, boat, bird watch, and for other recreational activities. The plaintiff McAllister is President of Peconic Baykeeper, Inc. and is a member of its Board of Directors. Plaintiff Alfred Chiofolo is a bayman who has made his living for forty-five years fishing these waters, who suffered a decline in his catch and is economically adversely affected, allegedly by the illegal conduct of the defendants.

The defendant Vector Control is a unit of Suffolk County with offices in Yaphank, New York. Vector Control is responsible for controlling mosquito infestations, which it accomplishes largely through the practice of "water management." Water management makes up about 70 percent of defendant Vector Control's mosquito control operations, and consists of the maintenance of 4,000,000 feet of ditches and 50,000 feet of pipelines. Vector Control's entire network consists of approximately 660 miles of "mosquito control ditches," fish reservoirs, and pipes, the majority of which are located in the wetlands of the Peconic and South Shore estuary systems. In addition to the operation of drainage ditches, Vector Control also conducts spraying activities which target mosquitoes at their larval stage, and spraying of pesticides to kill adult mosquitoes.

The plaintiffs allege that in the course of these Vector Control activities the defendants "discharged pollutants into waters of the United States" by (1) spreading "dredge spoil" over the wetlands that are adjacent to the defendants' mosquito control ditches; (2) discharging "fecal coliform bacteria" into Moriches Bay and other bodies of water; and (3) spraying "Scourge" and "Anvil," powerful pesticides that target adult mosquitoes, directly into or over open water.

**C.      The Clean Water Act**

 The plaintiffs' three causes of action are based on alleged violations of the federal Clean Water Act. Under the provisions of the Clean Water Act, it is unlawful to discharge "pollutants" into the waters of the United States without the required permit. Congress enacted the Clean Water Act for the purpose of restoring and maintaining "the chemical,

physical, and biological integrity of the Nation's waters."  *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102, 124 S. Ct. 1537, 1541-42, 158 L.Ed.2d 264 (2004) (quoting 86 Stat. 816, 33 U.S.C. § 1251).  "The Act prohibits 'the discharge of any pollutant by any person' unless done in compliance with some provision of the Act."  *Id.* (citing 33 U.S.C. § 1311(a)).  The Clean Water Act contains a "citizen suit" provision providing that any "person or persons having an interest which is or may be adversely affected" may sue to enforce any limitation in a Clean Water Act permit.  33 U.S.C. §§ 1365(a), (g); *Friends of the Earth, Inc.*, 528 U.S. 167, 174, 120 S.Ct. 693, 701, 145 L.Ed.2d 610.  In this case, there are two permitting provisions of the Clean Water Act that are relevant to the plaintiffs' causes of action:  (1) Section 402 of the Clean Water Act, 33 U.S.C. § 1342, which relates to the "discharge of a pollutant"; and (2) Section 404, 33 U.S.C. § 1344, which relates to the discharge of "dredged or fill material."

Section 402 of the Clean Water Act, 33 U.S.C. § 1342, establishes the "National Pollutant Discharge Elimination System," "[T]he NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters."  *S. Fla. Water Mgmt. Dist.*, 541 U.S. at 102, 124 S.Ct. at 1541-42.  In addition to federally-issued permits, Congress provided authority for States to issue NPDES permits for discharge into waters within its jurisdiction, provided that the State develops a permitting program and obtains approval for that program from the USEPA.  33 U.S.C. § 1251(b).  New York created the "state pollutant discharge elimination system" in direct compliance with the Clean Water Act.  *See* N.Y. Envir. Conserv. Law § 17-0801

(McKinney 2006) (effective 1973).  The SPDES program is administered by the New York State Department of Environmental Conservation.  Discharges of pollutants into waters that are within the limitations imposed by the NPDES and SPDES permits comply with the Act. 33 U.S.C. § 1342(k).

The phrase "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *No Spray Coalition, Inc. v. City of New York*, No. 00 Civ. 5395, 2005 WL 1354041, at *3 (S.D.N.Y. June 8, 2005). The term "pollutant" is defined as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).  The term "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling floating craft, from which pollutants are or may be discharged."   33 U.S.C. § 1362(13).

Section 404 of the Clean Water Act, 33 U.S.C. § 1344, relates specifically to "permits for [the discharge of] dredged or fill material" into waters of the United States. This section authorizes the "Secretary of the Army, acting through the Chief of Engineers," to issue permits for "the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a), (d).  The Secretary of the Army may issue general permits on a State, regional, or nationwide basis covering categories of activities,

but general permits may not last for a period longer than five years. 33 U.S.C. § 1344(e).

There are exceptions to the Section 404 permit requirement. Among the exceptions is an exclusion for the "discharge of dredged material . . . for the purpose of the construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches." 33 U.S.C. § 1344(f)(1)(c) (emphasis added). Under the regulations, the "[c]onstruction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance (but not construction) of drainage ditches" fall within the exception. 33 C.F.R. § 323.4(a)(3) (emphasis added); *see also, e.g., United States v. Sargent County Water Resource Dist. (Sargent I)*, 876 F. Supp. 1081, 1087 (D.N.D. 1992) ("The discharge of dredged or fill material for the purpose of maintaining a drainage ditch is exempt from the CWA.").

### D.     As to Mosquito-Borne Illnesses in Suffolk County

On this subject another definition of terms is in order. A pathogen is a specific cause of a disease, such as a bacterium or virus. A vector is an organism, such as an insect, that is capable of transmitting a pathogen from one organism to another.

There are approximately fifty different species of mosquitos in Suffolk County. In the juvenile stage, mosquitos live in or near water. In the adult stage, mosquitos are terrestrial, meaning they live on land. Mosquitos are vectors that are capable of transmitting a variety of diseases including malaria, Eastern Equine Encephalitis and West Nile Virus, which are potentially fatal diseases. West Nile Virus is the most common mosquito-borne disease in the United States. Since 1999, there have been more than 30,000

reported cases of West Nile Virus in the Western Hemisphere, with more than 1,000 deaths. In Suffolk County there have been thirty cases of mosquito-transmitted diseases, primarily West Nile Virus. Of these thirty cases, there have been four deaths. There have been hundreds of findings of West Nile Virus in the mosquito pools, birds, horses and humans in Suffolk County. It is undisputed that the Suffolk County Division of Vector Control suppresses mosquito propagation for health reasons (Tr. at 78). It is also conceded by the plaintiffs that one of the means that Vector Control utilizes to suppress mosquitoes is to channel and drain water in swampy areas to minimize mosquito breeding areas (Tr. at 79).

Malaria is the world's most common mosquito-borne disease and one of the most devastating disease in the world (Tr. at 826). There are between three hundred and five hundred million cases of malaria in the world with more than 1.3 million deaths each year (Tr. at 826). This disease primarily affects children, pregnant woman and the elderly. In 1999, there were two cases of malaria in ten year old boys in Suffolk County. Eastern Equine Encephalitis is a rare and a life-threatening disease. Fifty to seventy percent of the cases are fatal. People who survive Eastern Equine Encephalitis are frequently permanently disabled (Tr. at 484).

A "public health threat" is a disease or condition which threatens the public's health. It is declared by the local health department and must be approved by the New York State Commissioner of Health. Public health threats based upon the presence of vector-borne diseases in Suffolk County were issued by the New York State Commissioner of Health for the years 1994, 1996, 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2006 (Tr. at 831). The

2005 public health threat was issued because mosquito pool specimens indicated that the West Nile Virus was present in Suffolk County (Tr. at 830).

### E. The Plaintiffs' Contentions

A review of the plaintiffs' post-trial memorandum of law reveals the following material contentions:

1. The defendants have discharged and continue to discharge adulticides into the waters of the United States in violation of the Clean Water Act, as follows:

(a) Defendants spraying of adulticides from helicopters and trucks directly over and onto Suffolk County water bodies constitutes a "discharge."

(b) The adulticides sprayed by the defendants onto water of the United States are "pollutants" for purposes of the Clean Water Act.

(c) The defendants discharged pesticides directly over and into "navigable waters."

(d) The defendants' helicopters and trucks are "point sources" for purposes of the Clean Water Act.

(e) The defendants do not have a permit under the Clean Water Act for their discharges of adulticides directly over and onto navigable waters.

2. The defendants have discharged dredge and fill material into the waters of the United States in violation of the Clean Water Act, as follows:

(a) The defendants' discharge of dredge material into the tidal wetlands constitutes a "discharge of pollutants" under 33 U.S.C. § 1362(12)(A).

(b) The machines and hand tools used by the defendants are "point sources."

(c) The wetlands located in the Peconic and South Shore estuary systems are "waters of the United States" within the meaning of 33 U.S.C. § 362(7).

d) The defendants' activities are neither authorized by a Clean Water Act § 404 permit, nor exempt from permitting requirements, as follows:

1) The Nationwide permit does not authorize the admitted discharges.

2) The defendants' ditching and discharges are not exempt under 33 U.S.C. § 1344(f)(1)(c).

3) Even if § 1344(f)(1)(c) is applied, the defendants' ditching exceeded maintenance.

3. The defendants have discharged fecal coliform into waters of the United States in violation of the Clean Water Act.

The Court will now review each of these contentions.

F.     The Adulticides In This Case Are Not "Pollutants" Within the Provisions of the Clean Water Act

The objective of the Clean Water Act "is to restore and maintain the chemical, physical and biological integrity of the nation's waters . . . and that the discharge of pollutants into the navigable waters be eliminated by 1985."  33 U.S.C. § 1251(6).  The Clean Water Act prohibits "the discharge of pollutants" without permit.  In addition, the Clean Water Act defines "discharge of pollutants" as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  As stated above, the term

"pollutant" is defined in the Clean Water Act:

> The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

33 U.S.C. § 1362(6).

The only possible terms in that definition that could apply to the pesticides used here is that of "chemical wastes" and "discarded material." In *Fairhurst v. Hagener*, 422 F.3d 1146 (9th Cir. 2005), the Ninth Circuit considered "whether a pesticide applied directly and intentionally to United States waters for the purpose of eliminating pests is a chemical waste for the purposes of 33 U.S.C. § 1362(6), when such application is carried out in accordance with an EPA-approved FIFRA label, and when the pesticide performs as intended." *Fairhurst*, 422 F.3d at 1148-1149. The Court reviewed the meaning of the term "chemical waste," including dictionary definitions and concluded:

> A plain meaning analysis of the phrase "chemical waste" thus suggests that a pesticide that is intentionally applied to the water and leaves no excess portions after performing its intended purpose is not a "chemical waste."

> This analysis accords with the EPA's construction of the CWA's definition of "chemical waste" in the context of intentionally applied pesticides. In July, 2003 the EPA issued a memorandum entitled "Interim Statement and Guidance on Application of Pesticides to Waters of the United States in Compliance with FIFRA" ("Interim Statement") to address this issue. . . . The Interim Statement asserts that the "EPA has evaluated whether pesticides applied consistent with FIFRA fall within any of the terms in section 506(2) [defining the term 'pollutant'], in particular whether they are 'chemical wastes' or 'biological materials.' EPA has concluded that they do not fall within either term."

* * * *

Therefore, we conclude that pesticides that are applied to water for a beneficial purpose and in compliance with FIFRA, and that produce no residue or unintended effects, are not "chemical wastes," and thus are not "pollutants" regulated by the CWA. Because intentionally applied and properly performing pesticides are not "pollutants," a potential discharger is not required to secure a NPDES permit for such pesticides before discharge.

* * * *

Thus, we hold that the CWA did not require Hagener to secure a NPDES permit.

*Id.* at 1149-1151 (emphasis supplied).

Again, referring to the USEPA Interim Statement, the term "chemical waste" does

not apply to the sprayed pesticides, as follows:

EPA has evaluated whether pesticides applied consistent with FIFRA fall within any of the terms in section 506(2), in particular whether they are "chemical wastes" or "biological materials." EPA has concluded that they do not fall within either term. First, EPA does not believe that pesticides applied consistent with FIFRA are "chemical wastes." The term "waste" ordinarily means that which is "eliminated or discarded as no longer useful or required after the completion of a process." *The New Oxford American Dictionary* 1905 (Elizabeth J. Jewell & Frank Abute eds. 2001); *see also The American Heritage Dictionary of the English Language* 1942 (Joseph P. Pickett ed.,4th ed. 2000) (defining waste as "[a]n unusable or unwanted substance or material, such as a waste product"). Pesticides applied consistent with FIFRA are not such wastes; on the contrary, they are EPA-evaluated products designed, purchased and applied to perform their intended purpose of controlling target organisms in the environment. Therefore, EPA concludes that "chemical wastes" do not include pesticides applied consistent with FIFRA.

* * * *

EPA also interprets the term "biological materials" not to include pesticides applied consistent with FIFRA. We think it unlikely that Congress intended

EPA and the States to issue permits for the discharge into water of any and all material with biological content. With specific regard to biological pesticides, moreover, we think it far more likely that Congress intended not to include biological pesticides within the definition of "pollutant." This interpretation is supported by multiple factors. *Interim Statement* 68 F.R. 48385, 48387 (August 13, 2003).

### G.      As to a "Discharge of a Pollutant"

Atmospheric emission of aerial adulticides are not defined as a "pollutant." The evidence in this case shows that at all times, the spraying was conducted in a manner that created an aerial cloud or fog; at no time was the spraying made directly into navigable waters.

Initially, as a matter of interpretation, the Court notes that the "EPA has never advocated the unlimited definition of 'pollutant'" and "Congress did not intend the term 'pollutant' to be all inclusive," - nor should the Court "expansively construe the term 'pollutant,' which Congress has specifically defined." *National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 168, 173, 179 (D.C. Cir. 1982). "The intent of the Congress has been clear enough that guesswork has been left behind." *United States v. Gaf Corporation*, 389 F. Supp. 1379, 1387-88 (S.D. Texas 1975).

Further, the interaction between mosquito control programs and the Clean Water Act as referred to in the Federal Insecticide and Rodenticide Act ("FIFRA") 7 U.S.C. § 135, *et seq.* (1970), was addressed by the U.S. EPA Interim Statement which reads, in part, as follows:

The Environmental Protection Agency (EPA) is issuing this interpretation of the Clean Water Act (CWA) to address jurisdictional issues under the

CWA pertaining to pesticides regulated under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) that are applied to waters of the United States. This Memorandum is issued, in part, in response to a statement by the U.S. Court of Appeals for the Second Circuit in *Altman v. Town of Amherst* that highlighted the need for EPA to articulate a clean interpretation of whether National Pollutant Discharge Elimination System (NPDES) permits under section 402 of the CWA are required for applications of pesticides that comply with relevant requirements of FIFRA. EPA will solicit comment on this interim statement through the Federal Register prior to determining a final agency position. Until that position is made final, however, the application of pesticides in compliance with relevant FIFRA requirements is not subject to NPDES permitting requirements, as described in this statement.

. . . This memorandum addresses two sets of circumstances for which EPA believes that the application of a pesticide to waters of the United States consistent with all relevant requirements of FIFRA does not constitute the discharge of a pollutant that requires an NPDES permit under the Clean Water Act:

1)    The application of pesticides directly to waters of the United States in order to control pests. Examples of such applications include applications to control mosquito larvae or aquatic weeds that are present in the waters of the United States.

2)    The application of pesticides to control pests that are present over waters of the United States that results in a portion of the pesticides being deposited to waters of the United States; for example, when insecticides are aerially applied to a forest canopy where waters of the United States may be present below the canopy or when insecticides are applied over water for control of adult mosquitos.

It is the Agency's position that these types of applications do not require NPDES permits under the Clean Water Act if the pesticides are applied consistent with all relevant requirements of FIFRA. Applications of pesticides in violation of the relevant requirements of FIFRA would be subject to enforcement under any and all appropriate statutes including, but not limited to FIFRA and the Clean Water Act.

*     *     *     *

In September 2002, the Second Circuit remanded the *Altman* case for further consideration and issued a Summary Order that stated, "Until the EPA articulates a clear interpretation of current law among other things, whether properly used pesticides released into or over waters of the United States can trigger the requirement for an NPDES permit [or a state-issued permit in the case before the court] the question of whether properly used pesticides can become pollutants that violate the Clean Water Act will remain open." 46 Fed. Appx. 62, 67 (2d Cir. 2002). This Memorandum provides EPA's interpretation of how the CWA currently applies to the two specific circumstances listed above. Under those circumstances, EPA has concluded that the CWA does not require NPDES permits for a pesticide applied consistent with all relevant requirements of FIFRA. This interpretation is consistent with the circumstances before the Ninth Circuit in *Headquarters, Inc. v. Talent Irrigation District,* 243 F.3d 526 (9th Cir. 2001), and with the brief filed by the United States in the *Altman* case.

$$* \quad * \quad * \quad *$$

Many of the pesticide applications covered by this memorandum are applied either to address public health concerns such as controlling mosquitos or to address natural resource needs such as controlling non-native species or plant matter growth that upsets a sustainable ecosystem. Under FIFRA, EPA is charged to consider the effects of pesticides on the environment by determining, among other things, whether a pesticide "will perform its intended function without unreasonable adverse effects on the environment," and whether "when used in accordance with widespread and commonly recognized practice [the pesticide] will not generally cause unreasonable adverse effects on the environment." FIFRA section 3(c)(5).

The application of a pesticide to waters of the U.S. would require an NPDES permit only if it constitutes the "discharge of a pollutant" within the meaning of the Clean Water Act. the term "pollutant" is defined in section 502(6) of the CWA as follows:

$$* \quad * \quad * \quad *$$

> The term 'pollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

EPA has evaluated whether pesticides applied consistent with FIFRA fall within any of the terms in section 506(2), in particular whether they are "chemical wastes" or "biological materials." EPA has concluded that they do not fall within either term.

Interim Statement, 68 F.R. 48385, 48387-88.

The courts have commented on the interpretive effect of this Interim Statement by the USEPA. In *Fairhurst*, the Ninth Circuit held that:

> The EPA's Interim Statement is entitled to some deference. In *Resource Investments, Inc. v. U. S. Army Corps. of Engineers,* 151 F.3d 1162, 1165 (9th Cir. 19998), this court held that "an agency's construction of a statute it is charged with enforcing is normally entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *See also League of Wilderness Defenders v. Forgren*, 309 F.3d 1181, 1189 (9th Cir. 2002) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 65 S.Ct. 161, 89 L.Ed. 124 (1944), for the proposition that the discretion the courts should afford to an agency interpretation of a statute "will depend on the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control").

> \*   \*   \*   \*

> We find the EPA interpretation as articulated in the Interim Statement "reasonable and not in conflict with the expressed intent of Congress." *Res. Invs., Inc.*, 151 F.3d at 1165. The interpretation also accords with the plain meaning of the term "chemical waste." . . . Therefore, we conclude that pesticides that are applied to water for a beneficial purpose and in compliance with FIFRA, and that produce no residue or unintended effects, are not "chemical wastes," and thus are not "pollutants" regulated by the CWA. Because intentionally applied and properly performing pesticides are not "pollutants," a potential discharger is not required to secure a NYDES permit for such pesticides before discharge. *Fairhurst*, 422 F.3d at 1150-51.

As to further authority of the effect of the Interim Statement, it has been held that

"the EPA's determination that a permit is not needed warrants consideration by the district

court" and "[e]ven more deference should be accorded a final regulation." *Saint John's Organic Farm v. Gem County Mosquito Abatement District*; No. 04 Civ. 87, 2007 WL 2461990, # 8 (D.Idaho August 27, 2007); *see also Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845-46, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (Finding that considerable weight should be afforded to EPA's construction of statutory scheme it is entrusted to administer where it has sought to give a reasonable interpretation of conflicting policies).

The EPA opinion supports the proposition that the application of pesticides in compliance with FIFRA requirements is not subject to the NPDES permitting requirements. Also, it confirms that the application of pesticides to waters of the United States consistent with FIFRA requirements does not constitute the "discharge of pollutant" that requires a NPDES permit under the Clean Water Act.

This subject was previously raised by counsel for the plaintiffs in *No Spray Coalition, Inc. v. The City of New York*, No. 00 Civ. 5395, 2000 WL 1401458 (S.D.N.Y. Sept. 25, 2000), *aff'd* 252 F.3d 148 (2d Cir. 2001). In this case, Judge Martin's comment on this general subject is similar to this Court's views and is worth repeating:

> In the last two years the spread of the West Nile Virus has caused increasing concern among federal, state, and local health officials. Acting in coordination with the federal Centers for Disease Control and Prevention and the Environmental Protection Agency (the "EPA"), along with The New York State Department of Health and Environmental Conservation, the City of New York, like many other cities and counties, is engaged in an extensive spraying of insecticides in an attempt to eradicate the mosquitos that carry the disease.

Despite the unusual unanimity of governmental agency opinion that this spraying program is in the best interests of preserving the public health, the plaintiffs in this action seek to enjoin the spraying program because they contend that it poses a substantial danger to human health and the environment. Armed with their own medical and environmental experts and aided by able counsel, Plaintiffs argue that the spraying program is both ineffective and a danger to the community.

It is not the role of the Court to resolve the policy question of whether the benefits of the spraying program outweigh the danger that it poses for individuals or the environment. Fortunately for the community, that question is to be decided by public health and environmental officials who are far better qualified to weigh the competing interests. The role of the Court is limited to determining whether in carrying out its mosquito control program, the City has violated any federal statute that Congress has authorized the plaintiffs to sue to enforce.

*No Spray Coalition*, 2000 WL 1401458, at *1.

In the *No Spray Coalition* case, the Court then reviewed the Clean Water Act

contentions of the plaintiffs, in language applicable to this case:

The Clean Water Act prohibits the (1) discharge (2) of a pollutant (3) from a point source (4) into the waters of the United States. 33 U.S.C. § 1311(a). Plaintiffs allege that (1) the spraying is a discharge; (2) the trucks and helicopters from which the pesticides are sprayed are point sources; and (3) the pesticides are pollutants that are (4) discharged into waters of the United States. Plaintiffs' argument stretches the language of the Clean Water Act beyond its reasonable meaning and results in a conflict with the apparent purpose of Congress to leave the regulation of the use of pesticides to the EPA and the Attorney General under FIFRA.

*Id.* at *2.

Here, the FIFRA compliant labels for both Scourge and Anvil allow for aerial ULV

application. Vector Control complied with these label requirements by aerial application

using equipment capable of producing droplet particles of the appropriate size - 8-20

microns in the case of Scourge and less than 50 microns in the case of aerial application of Anvil.

Further, the instructions for Scourge specifically state that "[t]his product is used in specially designed aircraft capable of applying ultra low volume of finished spray formulation . . .." The label further cautions "[a]void direct application over lake, ponds and streams."

Finally, both labels caution against direct application to water in connection with terrestrial uses. Anvil provides that: "For terrestrial uses, do not apply directly to water, or to areas where surface water is present or to intertidal areas below the mean high water [mark]." Similarly, Scourge provides that: "For terrestrial uses, do not apply directly to water, to areas where surface water is present, or to intertidal areas below the mean high water mark. Drift and runoff from treated sites may be hazardous to fish in adjacent waters." Ninivaggi specifically testified that Vector Control does not apply these products for terrestrial use (Tr. at 725), and there is nothing in the record to suggest that Vector Control did not comply with the label instructions.

Also, the Court in *No Spray Coalition* addressed the interesting and relevant issue of the unintended drift of particles of the spray to the surrounding waters:

> Plaintiffs contend that the unintended drift of minuscule particles of the City's pesticide spray into the waters surrounding New York City violates the Clean Water Act. However, this is the natural consequence of the use of the pesticides for the very purpose for which they were approved by the EPA. The label which specifies the uses for which the pesticide has been approved expressly states that it may be used for ground or aerial use where mosquitos are present "in vegetation surrounding parks, woodlands,

swamps, marshes . . .. <u>Given the broad definition of navigable waters in the Clean Water Act, *see* 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2, any approved use of the pesticide, other than in a desert, will inevitably result in a drift of the spray into navigable waters.</u> Because the EPA in registering the pesticide has made a determination that aerial use will not have "unreasonable adverse effects on the environment," it would frustrate the intent of the regulatory scheme to hold that such an approved use violates the Clean Water Act.

*Id.* at * 2 (emphasis supplied).

In its opinion affirming Judge Martin in *No Spray Coalition*, the Second Circuit stated: "We therefore agree with the district court that the pesticides are not being 'discarded' when sprayed into the air with the design of effecting their intended purpose: reaching and killing mosquito and their larvae." 252 F.3d at 150; *see also Chemical Weapons Working Group, Inc. v. Department of the Army*, 111 F.3d 1485, 1490-91 (10th Cir. 1997); *United States Environmental Protection Agency v. Port Authority of New York*, 162 F. Supp. 2d 173, 189 (S.D.N.Y. 2001). The Court notes that there is always a potential problem involving the spraying of pesticides and unintended drifting and whether the spraying is accomplishing its intended purpose. Accordingly, based on the statutes, the USEPA Interim Statement, and the cases, even if small amounts of pesticide did reach navigable waters, that does not constitute a "discharge of pollutants" under the provisions of the Clean Water Act.

Based on the cases cited and the USEPA Interim Statement, the Court finds that the plaintiffs failed to prove that the application of the pesticides by Vector Control of Suffolk County resulted in the discharge of pollutants under the provisions of the Clean Water Act.

In addition, it has been held that properly administered aerial pesticides are not "discarded material" under the Resource Conservation and Recovery Act ("RCRA"). Again, I refer to the excellent descriptive language in *No-Spray Coalition* decision I, where it was stated:

> Once again, it would contort the statutory language and do violence to the Intent of Congress in enacting RCRA to hold that pesticide that has been sprayed but has yet to reach the mosquitos or their habitats is "discarded material." The very Second Circuit Court of Appeals case that Plaintiffs cite, *Connecticut Coastal Fishermen's Association v. Remington Arms Co.*, 989 F.2d 1305, 1316 (2d Cir. 1993), indicates that material is not discarded until after it has served its intended purpose. Here, the intended purpose of the spray is to drift through the air until coming to rest on the mosquitos and their habitats. Thus, it cannot be said that the insecticide is discarded when it is sprayed, and Plaintiffs' claims under RCRA are dismissed.

*No Spray Coalition*, 2000 WL 1401458 at *4.

No "spray" case could be complete without a review of the Altman saga. In *Altman v. Town of Amherst,* 190 F. Supp. 2d 467 (W.D.N.Y. 2001) (*Altman I*), the plaintiffs were residents of the Town of Amherst who, in April 8, 1998, commenced a citizen suit against the Town. The complaint alleged that the Town violated the Clean Water Act by its application of pesticides to the Town waters and wetlands, for the purpose of mosquito control without a NPDES or SPDES permit. In a decision filed March 13, 2001, the Western District of New York granted the Town's motion for summary judgment, finding that the "pesticides, when used for their intended purpose, do not constitute a 'pollutant' for purposes of the Clean Water Act." *Altman I*, 190 F. Supp. 2d at 471.

On appeal to the Second Circuit, by summary order, the District Court decision was

vacated and the case remanded. The Court of Appeals held that fact issues remained as to

whether the wetlands were subject to the CWA; whether pesticides were properly used; and

whether they were "pollutants" under the CWA. In its decision, *Altman v. Town of

Amherst*, (*Altman II*), 47 Fed. Appx. 462, 66 (2d Cir. 2002), the Court stated:

> the District Court acted on the basis of an incomplete record, having
> unnecessarily curtailed or foreclosed the discovery sought by plaintiffs, and
> having failed to consider a number of threshold questions of law. We
> therefore vacate the judgment and remand with directions that the Court
> afford plaintiffs a reasonable opportunity to undertake discovery with
> respects to their claims, inter alia, that defendant has sprayed pesticides
> from truck-loaded spray equipment as part of its mosquito control program;
> that it sprays these pesticides into 'waters of the United States,' . . . , within
> the Town; that these sprays or discharges of pesticide are from a so-called
> point source into the wetlands; and that these pesticides, if and when applied
> to such wetlands, are pollutants subject to federal permit requirements.

In *Altman v. Town of Amherst (Altman II)*, 98 CV 237, Memorandum of Decision

and Order, February 13, 2008, the Western District noted the USEPA Interim Statement,

which concluded that "pesticides applied consistent with the relevant FIFRA requirements

are not considered 'pollutants' under the CWA." *Altman III*, 98 CV 237, February 13,

2008, at 5. The Court also noted that on November 27, 2006, the EPA enacted the

following regulation:

> "The following discharges do not require NPDES permits:
>
> . . .
>
> (h) The application of pesticides consistent with all relevant requirements
> under FIFRA (i.e., those relevant to protecting water quality), in the
> following two circumstances:
>
> (1) The application of pesticides directly to waters of the United States in

order to control pests. Examples of such applications include applications to control mosquito larvae, aquatic weeds, or other pests that are present in waters of the United States.

(2) The application of pesticides to control pests that are present over waters of the United States, including near such waters, where a portion of the pesticides will unavoidably be deposited to waters of the United States in order to target the pests effectively; for example, when insecticides are aerially applied to a forest canopy where waters of the United States may be present below the canopy or when pesticides are applied over or near water for control of adult mosquitoes or other pests." 40 C.F.R. § 122.3(h); 71 FR 68483, 2006 WL 3390233.

*Id.* at 6.

Again, the District Court granted summary judgment dismissing the complaint, stating:

Faced with these uncontested facts, there is nothing before me to suggest that the Town failed to comply with FIFRA. In turn, no NPDES permit was required for the pesticides applied over or near the waters and wetlands of the Town as part of its Pesticide Program. *See* 40 C.F.R. § 122.3(h). Because no NPDES permit was required for the Town's Pesticide Program, I find that no CWA violation occurred.

*Id.* at 7.

Similarly, here, there is nothing in the record to suggest that the County did not comply with the terms of FIFRA. Therefore, no SPDES permit was required for this application of adulticides in the Vector Control program.

Accordingly, the Court finds that the plaintiffs failed to prove that adulticides sprayed for mosquito control by Vector Control of Suffolk County are "pollutants" within the provisions of the Clean Water Act.

**H.     The Trucks and Helicopters Used by Vector Control for Spraying Pesticides Do Not Constitute "Point Sources"**

As stated above, the "Clean Water Act generally prohibits discharging pollutants into navigable waters of the United States without a permit.  "But it only regulates 'discharges' of pollutants from a point source."  *United States v. West Indies Transport, Inc.*, 127 F.3d 299, 307-08 (3d Cir. 1997), *cert. den.* 118 S.Ct. 700, 522 U.S. 1052, 139 L.Ed 644 (1998).  So that the Clean Water Act only regulates discharge of pollutants from "point sources."  In section 1362(14) the term "point source" is defined:

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.  This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14).

There is authority that the "discharge of a pollutant" does not include an "indirect discharge."  40 C.F.R. § 122.2.  In addition, in *Dague v. City of Burlington*, 935 F.2d 1343, 1354 (2d Cir. 1991), *rev'd on other grounds,* 505 U.S. 557, 112 S.Ct. 2638 (1992), in holding that a culvert running under a railroad was a "point source" for the discharge of pollutants within the meaning of the Clean Water Act, the Court referred to a "classic 'point source' discharge."  The Second Circuit stated that "the definition of a point source is to be broadly interpreted."  *Id., see also Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 119 (E.D.N.Y. 2001) (finding that *Dague* required that "point source" be given broad interpretation and culverts from which ground water leachate entered a pond, qualified).

However, two years later, the same court, and, in fact, the same Second Circuit Judge, determined that a human being could not be a point source. In *United States v. Plaza Health Laboratories, Inc.*, 3 F.3d 643, (2d Cir. 1993) (Pratt, C.J.), the term "point source" was further interpreted:

> Human beings are not among the enumerated items that may be a "point source." Although by its terms the definition of "point source" is nonexclusive, the words used to define the term and the examples given ("pipe, ditch, channel, tunnel, conduit, well, discrete fissure", etc.) <u>evoke the images of physical structures and instrumentalities that systematically act as a means of conveying pollutants from an industrial source to navigable waterways</u>.

> \*    \*    \*    \*

> This emphasis was sensible, as "[i]ndustrial and municipal point sources were the worst and most obvious offenders of surface water quality. They were also the easiest to address because their loadings emerge from a discrete point such as the end of a pipe." David Letson, *Point/Nonpoint Source Pollution Reduction Trading: An Interpretive Survey*, 32 Nat.Resources J. 219, 221 (1992). (Emphasis supplied).

*Plaza Health*, 3 F.3d at 646 (emphasis supplied); *see also Hudson River Keeper Fund v. Harbor at Hastings*, 917 F. Supp. 25 (S.D.N.Y. 1996) (citing *Plaza Health* and finding that a building was not a point source where trash from the building fell into the Hudson River and rainwater entered the river through runoff from the building because "any discharge of material [was] not . . . deliberate or systematic").

Unlike the railroad culvert, the helicopters and trucks involved in the Vector Control spraying are not "instrumentalities that systematically act as a means of conveying pollutants from an industrial source to navigable waterways." They release fine ULV

pesticide particles into the air, intended to drift in the air and make contact with adult mosquitos. In such an operation, there is no intentional conveyance of pollutants into navigable waters. On the contrary, the trucks and helicopters spray the pesticides into the air, not the water, unlike the planes that intentionally dropped bombs into the water in *Weinburger v. Romero Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed 2d 91 (1982); or the trucks that intentionally poured liquid manure into a stream in *Concerned Area Residents for the Environment v. Southview Farm*, 34 F.3d 114 (2d Cir. 1994); or where the Remington Arms Company owned and operated a trap and skeet shooting club which deposited 2400 tons of lead shot and 11 million pounds of clay target fragments on land and in the adjacent waters of the Long Island Sound in *Connecticut Coastal Fisheries Association v. Remington Arms Co., Inc.*, 989 F.2d 1305 (2d Cir. 1993).

In this case, the trucks and the helicopter are used by Vector Control for the purpose of spraying pesticides into the air, and not for the purpose of placing pesticides into the water. The Court finds that they are not "point sources" within the purview of the Clean Water Act.

In *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181 (9th Cir. 2002), the United States Forest Service had a program of annual aerial insecticide spraying over 628,000 acres of national forest lands in Washington and Oregon. The spraying was aimed at controlling a predicted outbreak of a disease that kills Douglas fir trees. *Id.* at 1183. An environmental group filed suit asserting that the Forest Service failed to obtain a NPDES permit. The issue in *Forsgren* was whether spraying insecticide from aircraft is point

source pollution within the purview of the Clean Water Act.  In a summary fashion, the Ninth Circuit determined that the insecticides at issue met the definition of a "pollutant"; that  these insecticides were sprayed directly into rivers covered by the Act; and "an airplane fitted with tanks and mechanical spraying apparatus is a discrete conveyance."  It therefore found that "all the elements of the definition of point source pollution are met." *Id.* at 1185.

Initially, the Court notes that "the Forest Service [did] not dispute any of this."  Also, the aircraft in *Forsgren* was equipped with tanks that sprayed pesticide "directly into rivers which are waters covered by the Clean Water Act."  *Id.* at 1185.  In addition, in footnote 4, the Ninth Circuit fortified its opinion that "other Courts have not hesitated to find that the discharge of pollutants from an aircraft over navigable waters" were point source discharges, by citing to *Romero-Barcelo v. Brown*, 478 F. Supp. 646, 664 (D.P.R. 1979), vacated on other grounds, 643 F.2d 855 (1st Cir. 1981), and *rev'd on other grounds* in 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).  The *Romero-Barcelo* decision involved the "release or firing of ordinance from aircraft into the navigable waters." *Romero v. Barcelo*, 478 F. Supp. at 664.

In this case, the aircraft is being used for mosquito control to protect public health – not to protect timber crops.  The aircraft in this case it not systematically spraying over or into navigable waters.  Also, following the Second Circuit definition, the aircraft on these potential life-saving missions is not an "instrumentality that systematically acts as a means of conveying pollutants from an industrial source to navigable waterways,."  *See Plaza*

*Health Laboratories, Inc.*, 3 F.3d at 646.

In the Court's view, the plaintiffs failed to establish that Vector Control and its trucks and helicopters discharged pesticides from a "point source" as defined in the Clean Water Act.

## I.    As to Dredge Maintenance

The plaintiffs contend that the defendants have discharged "dredge and fill material" into the waters of the United States in violation of the Clean Water Act. In this regard, the plaintiffs assert that the defendants' discharge of dredge material into the tidal wetlands constituted "discharge of pollutants" under 33 U.S.C. § 1362(12)(A). The plaintiffs contend that in using heavy equipment, the defendants "ditched" or "dug" nearly 147 miles within the Peconic and South Shore estuary systems. In conducting these mechanized ditching activities, the defendants "broadcast" or "backblade" the dredged material back into the adjacent wetlands. According to the plaintiffs, this constitutes a "discharge of a pollutant" within the provisions of the Clean Water Act.

In addition, the plaintiffs contend that the machines and hand tools used by the defendants in their ditching activities are "point sources" within the meaning of the Clean Water Act.

In support of their contentions, the plaintiffs cited *United States v. Deaton*, 209 F.3d 331, (4th Cir. 2000), *cert. den.*, 541 U.S. 972, 124 S.Ct. 1874, 158 L.Ed.2d 466 (2004), which held that sidecasting, which involves disposed of dredged or excavated material from a wetland back into the same wetland, constitutes a discharge of a pollutant under the Clean

Water Act.  However, in *Deaton*, the defendant purchased a parcel of land for new development.  There were no existing structures or drainage systems on the property.  Deaton was advised that a U.S. Army Corps of Engineers permit was required in order for him to construct a drainage ditch across the property.  Notwithstanding this requirement, Deaton had a bulldozer dig a 1240 foot ditch that ran through the wetlands on the property.  *Id.* at 333. The Fourth Circuit determined that the new ditch construction and the sidecasting, without a permit, was sufficient to present a claim for violation of the Clean Water Act.  *Id.* at 335-36.

The proof at the trial revealed that the County of Suffolk has maintained a mosquito grid ditch system since the 1930s.  Over the years, the County has maintained these ditches, which includes the removal of silt, sediment and small brush from the ditches.  Also,  the evidence is clear that Vector Control has not created any new ditches.  The only evidence of a new ditch, in testimony by Dr. Szekielda, is based on his review of aerial photographs taken from a distance of 10,000 feet over the ground.  He made no personal visit to the area.  This testimony was refuted by Ninivaggi who actually walked through the area.  The Court does not credit this testimony by Dr. Szekielda and finds that the Vector Control maintained existing ditches and did not construct any new ditches.  Also, during this time, animals excreted feces in the Suffolk County wetlands.  It was conceded by the plaintiffs that "fecal coliform bacterial," a natural byproduct of animal feces, is not a chemical.  (Tr. at 118).

The Court further notes that the removal of accumulated silt and foliage in the pre-existing grid ditch system is not prohibited and does not require a permit, as stated in 33

U.S.C. § 1344(f)(1), which reads as follows:

> (f) Non-prohibited discharge of dredged or fill material
>     (1) Except as provided in paragraph (2) of this subsection, the discharge of dredged or fill material –
>
> \* \* \* \*
>
> (B) for the purpose of maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, and bridge abutments or approaches, and transportation structures;
>
> (C) for the purpose of construction or maintenance of farm or stock ponds or irrigation ditches, or the maintenance of drainage ditches;
>
> \* \* \* \*
>
> is not prohibited by or otherwise subject to regulation under this section or section 1311(a) or 1342 of this title (except for effluent standards or prohibitions under section 1317 of this title).

The Court finds that the maintenance of the Suffolk County ditch network falls within the stated section of 1344(f)(1). No permit is required under this section. Further, the C.F.R. regulations permit maintenance, but not modification or changes, in drainage ditches, and redeposits of dredged material. *See* 33 C.F.R. § 323.4(a)(2),(3) and 33 C.F.R. § 323.2(d)(4)(I).

This exemption for the grid ditch system is fortified by the implementing regulations for Section 1344(f)(1), as follows:

> (2) Maintenance, including emergency reconstruction of recently damaged parts, or currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge abutments or approaches, and

transportation structures.  Maintenance does not include any modification that changes the character, scope or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

(3)   Construction or maintenance of farm or stock ponds or irrigation ditches, or the <u>maintenance (but not construction) of drainage ditches</u>. Discharges associated with siphons, pumps, headgates, wingwalls, weirs, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

33 C.F.R. § 323.4(a)(2)(3) (emphasis added).

(4)   Section 404 authorization is not required for the following:

(I)   Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the United States as defined in paragraphs (d)(5) and (d)(6) of this section; however, this exception does not apply to any person preparing to undertake mechanized landclearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material unless the person demonstrates to the satisfaction of the Corps, <u>or EPA as appropriate</u>, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (d)(5) and (d)(6) of this section.  The person proposing to undertake mechanized landclearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States.

33 C.F.R. § 323.2(d)(4)(I) (emphasis added).

Here, the County has complied with all the requirements for an exemption from a Clean Water Act Section 404 permit for its grid ditch maintenance.

An important case on the subject of ditch maintenance is *United States v. Sargent County Water Resources District* (*Sargent I*), 876 F. Supp. 1081 (D.N.D. 1992).  In *Sargent*

*I*, the United States brought an action against a county water district and the State of North Dakota, alleging violations of the Clean Water Act in connection with work on drainage ditches. These ditches were constructed in the years 1917 through 1924. The County decided to clean the silt from the ditches in 1984 continuing to 1987. *Id.* at 1085. The County performed this work on the ditches without a permit by the Army Corps of Engineers. Similar to the ditch maintenance in this case, the excavated silt from the ditches were cast aside to wetland areas adjacent to the ditches. *Id.* The County contended that this ditch maintenance was permissible under 33 U.S.C. § 1344 (f)(1)(e). The Court held that "the discharge of dredged or fill material for the purpose of maintaining a drainage ditch is exempt from the CWA 33 U.S.C. § 1344(f)(1)(C)," stating:

> The issue in this case is whether the County's work constituted maintenance or whether it was new work requiring a permit. Maintenance requires that the original depth and bottom width of the ditch remain the same. *See United States v. County of Stearns*, No. 3-89-0616, slip op. at 19 (D.Minn. Mar. 15, 1990) (Stearns County I); *see also* 33 CFR § 323.4(a)(2) (any modification that changes the character, scope, or size of the original design is not maintenance).

*Id.* at 1087.

In *Sargent I,* the Court had to determine whether the County's work constituted maintenance or whether it was new work requiring a permit. In a subsequent proceeding in *United States v. Sargent (Sargent II)*, 876 F. Supp. 1090 (D.N.D. 1994), the Court, in its final determination, held that the removal of silt from the ditches was maintenance and not new construction. Thus, this maintenance was exempt from the requirement to secure a permit. In this respect, in language appropriate to the facts in this case, the Court stated:

The County is entitled to maintain the ditch it originally constructed . . .. In summary, the breadth of the evidence presented at trial as well as the creditability and consistency of the individuals who conducted the work on the drain, convinces this court that the work conducted on Drain 11 in the 1980's was for maintenance purposes, and not to improve the drain. The Court finds that the County has met its burden of proof on this issue.

*Id.* at 1101-02.

In addition, the *Sargent II* Court held that the sidecasting of material excavated from the ditches to a wetland area adjacent to the drainage canal, did not require a permit. *Id.* at 1103-04. In referring to the *Sargent* cases, in its prior decision, this Court stated that "Section 404 excludes discharge of dredged material for the purpose of maintaining of drainage ditches, which does not require a permit." *See Peconic BayKeeper, Inc. v. Suffolk County*, 04 CV 4828, Memorandum of Decision and Order, March 12, 2007 at p.11.

In the Court's view, this and similar decisions, are not only legally correct but make common sense. As stated by the Second Circuit in *June v. Town of Westfield*, 370 F.3d 255, 258 (2d Cir. 2004), the maintenance of areas like the ditches at issue in this case are exempt from permit requirements "to permit routine government maintenance of transportation, public water-supply, and similar facilities without the expense, consumption of time, and consequent danger to people and facilities that would inhere in a requirement for a prior permit."

Accordingly, the Court finds that the County's continued maintenance of its seventy year old mosquito grid ditches did not require a Section 404 permit.

Moreover, even without the requirement of a permit, the Court finds that the

maintenance of the mosquito control ditches by the County is covered by the Army Corps Nationwide Permit 3. Ninivaggi testified that "all the ditch maintenance activities that the County engaged in since 2004 were covered by the Army Corps of Engineers Nationwide Permit No. 3." (Tr. at 758). This testimony was unrefuted. Nationwide Permits provide for maintenance of a "currently serviceable structure or fill," as follows:

> 3. Maintenance. (A) The repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification. Minor deviations in the structure's configuration or filled area including those due to changes in materials, construction techniques, or current construct codes or safety standards which are necessary to make repair, rehabilitation, or replacement are permitted, provided the environmental effects resulting from such repair, rehabilitation, or replacement are minimal. Currently serviceable means useable as is or with some maintenance, but not so degraded as to essentially require reconstruction.

Army Corps of Engineers Nationwide Permit 3, 72 F.R. 11092, 11181 (2007).

Further, National Permit 3 does not totally prohibit the discharge of dredged or fill material into waters of the United States. It "requires the permittee to avoid and minimize discharges of dredged or fill material into the waters of the United States to the maximum extent practicable on the project side." Army Corps National Permit 3, Decision Document, March 1, 2007, at p. 27. Following the language of the statute 33 U.S.C. § 1344(e)(1), the Secretary of the Army, who issued the Nationwide Permit, necessarily found that the "discharge of dredged or fill material . . . will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect

on the environment."

The plaintiffs contend that Nationwide Permit No. 3, first provision, does not apply to the defendants' activities because that section speaks to maintaining "structures or fill" and the ditches in issue are neither. Instead, the plaintiffs argue, that the ditches in issue are "work," not "structures."

33 C.F.R. § 322.2(b) provides that:

The term structure shall include, <u>without limitation</u>, any pier, boat dock, ramp, wharf, dolphin, weir, boom, breakwater, bulkhead, revetment, riprap, jetty, artificial island, artificial reef, permanent mooring structure, power transmission lime, permanently moored floating vessel, piling, aid to navigation, or any other obstacle or obstruction. (Emphasis supplied).

Further, § 322.2(c) provides that:

The term work shall include, without limitation, any dredging or disposal of dredged material, excavation, filling, or other modification of a navigable water of the United States.

As an initial matter, the Court notes that the regulation specifically sets forth an exemplar set, without limitation. In the Court's view, the ditches at issue fall within the definition of "structure" as contemplated by Nationwide Permit No. 3.

However, even by the plaintiff's theory that the ditches are "work" rather than "structures," the Court finds that the ditching activities are covered by the terms of Nationwide Permit No. 3. Section (a) of Nationwide Permit No. 3 covers activities related to: "[t]he repair, rehabilitation, or replacement of any previously authorized, currently serviceable, structure or fill, or of any currently serviceable structure or fill authorized by 33 C.F.R. 330.3 . . . ." Specifically included in the terms of 33 C.F.R. 330.3 are

"[s]tructures or <u>work</u> completed before December 18, 1968, or in waterbodies over which the DE has not asserted jurisdiction at the time the activities occurred . . . ."  Here, the ditches were constructed in the 1930s, well before the grandfather date of December 18, 1968.  Accordingly, even if the ditches are "work," as argued by the plaintiffs, they fall within the terms of Nationwide Permit No. 3 by its express incorporation of section 330.3.

The Court notes that there is some disagreement as to whether the Nationwide Permit No. 3 satisfies the permitting requirements of the Clean Water Act.  In *United States v. Moses (Moses I)*, No. 05CR061, 2006 WL 1459836 (D. Idaho May 25, 2006), the defendant faced criminal charges based upon his discharge of pollutants without a permit as required by § 404 of the Clean Water Act.  *Moses I*, 2006 WL 1459836, at *2.  The defendant contended that his activities did not require individual authorization because they were covered by nationwide permits, including Nationwide Permit No. 3.  *Id.*  In rejecting this contention, the district court stated:

> Nationwide Permit No. 3 and CFR § 330.3(b), sometimes referred to jointly as the unasserted jurisdiction permit, do not apply to actions based on the Clean Water Act.  *See United States v. Cumberland Farms of Conn.*, 826 F.2d 1151 (1st Cir. 1987).

> The Corps administers a dual permit system under two different statutes - the River and Harbor Act and the Clean Water Act. In 1977, the Corps' regulations under the River and Harbor Act exempted from the individual permit requirement, structures or work completed before December 18, 1968 or in waterbodies over which the District Engineer had not asserted jurisdiction, provided there was no interference with navigation. *See* 33 C.F.R. § 322.4(g) (1977). No such exemption existed under the Clean Water Act.

> In 1982, two years after Moses began his work in Teton Creek, the Corps

published interim regulations contained in 33 C.F.R. § 330, which were applicable to permit programs under both the River and Harbor Act and the Clean Water Act. Unfortunately, the regulation was ambiguous and could be read to imply that the unasserted jurisdiction permit applied to activities regulated under both the River and Harbor Act and the Clean Water Act. However, "[i]n November 1986 ... the Corps expressly clarified its intent by specifying in the final regulations that the unasserted jurisdiction permit only applies to section 10 of the River and Harbor Act." *Cumberland*, 826 F.2d at 1160.

Thus, it was clear in 1980, when Moses began work on Teton Creek, that the unasserted jurisdiction permit did not apply to the Clean Water Act. Moreover, it was abundantly clear by 2002, 2003 and 2004, the years covered by the Indictment in this matter, that the unasserted jurisdiction permit did not apply to the Clean Water Act. Therefore, Moses' actions in 2002-2004 were clearly not permitted by Nationwide Permit No. 3 and 33 CFR § 330.3.

*Id.* at *3.

On appeal in, *United States v. Moses (Moses II)*, 496 F.3d 984 (9th Cir 2007), the

Ninth Circuit agreed, explaining:

Nor does Nationwide Permit No. 3, 67 Fed.Reg. 2078 (Jan. 15, 2002) (the Permit), supply the apotropaion that Moses seeks. In the first place, the Permit was issued pursuant to the Rivers and Harbors Act. *See* 33 U.S.C. § 403; *see also United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1157-59 (1st Cir. 1987). It does not apply to activities covered by the CWA. That was plain in 1980 when Moses first began his activities in Teton Creek, and it was plain during the period covered by the indictment. *See id.* at 1159-60.

*Moses II*, 496 F.3d at 992.

However, the Note following Nationwide Permit No. 3 states: "This NWP

authorizes the repair, rehabilitation, or replacement of any previously authorized structure

or fill that does not qualify for the Clean Water Act Section 404(f) exemption for

maintenance." This language alone seems to indicate the Nationwide Permit No. 3 unquestionably applies to and should be read in connection with the permit requirements of the Clean Water Act. However, as the Court finds that the defendant's ditching activities are exempt from the permitting requirements by Section 3314(f)(1), it need not dwell on this issue.

In addition, the evidence in this case reveals that the County Vector Control activities have been given multiple approvals by the New York State DEC, the delegate permitting authority. On August 30, 1990 in a letter to Vector Control from Kenneth L. Koetzner, Chief of the DEC Bureau of Marine Habitat Protection, it was stated:

> In response to the recent inquiry you made of Dominick Ninivaggi regarding the regulatory status of mosquito ditch maintenance in tidal wetlands, I can pass on to you the guidance I recently gave to Bureau and Regional regulatory staff. Basically, no Tidal Wetlands (Article 25) permit is necessary for the ordinary maintenance of mosquito ditches on tidal wetlands. This includes all the necessary operations normally associated with maintenance such as:
>
> > - Operation of motorized, tracked vehicles on the marsh
> >
> > - Excavation of material from the ditch
> >
> > - The disposal of the spoil from this operation on the adjacent wetland, whether by rotary ditching or by the back blading of the spoil into a thin layer, if a backhoe is used to clean the ditch.
>
> On-site disposal of the spoil as part of the maintenance operation recognizes the fact that for the most part it would be neither possible nor desirable for the spoil to be removed from the wetland.
>
> While no Article 25 permit is required for ditch maintenance, you should work with management staff (Dominick Ninivaggi) when determining which ditches on the State lands should be maintained.

(Defendants' Exh. FP) (emphasis supplied).

The cases advanced by the plaintiffs with regard to the ditching activities do not support their position that the maintenance activities of Vector Control violate the Clean Water Act. As stated previously, *United States v. Deaton*, *supra*, involved an unpermitted new ditch construction with incidental sidecasting. Here, we are concerned, not with new ditch construction, but with maintenance of seventy year old existing ditches. Further, in *Borden Ranch Partner v. U.S. Army Corps of Engineers*, 261 F.3d 810 (9th Cir. 2001), a new landowner intended to convert a ranch into vineyards and orchards by "deep ripping" disgorging soil; an entirely different operation from the dredge-cleaning involved in this case. Also, in *Aroyelles Sportswear League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir. 1983), the facts involved large scale deforestation; cutting lumber and vegetation; and digging a new drainage ditch -- activities not involved in this case. *See also Colvin v. United States*, 181 F. Supp. 2d 1050 (C.D. Cal. 2001), which involved the dumping of 5.4 million pounds of screw press rejects, constituting waste in a ranch on the shoreline of the Salton Sea; also an entirely different factual situation from the facts in this case.

In addition, the plaintiffs contend that the defendants' ditching activities and discharges are not exempt under the provisions of Section 1344(f)(1). The Court disagrees. This section states that "maintenance of drainage ditches . . . is not prohibited or otherwise subject to regulation under this section or Section 1311(a) or 1342 of this Title." The Court finds that the unambiguous and express language of this section states that a drainage ditch, similar to those at issue in this case, is not prohibited or otherwise subject to regulation

under these statues.  Nothing could be clearer.  In addition, notwithstanding the plaintiffs'

contention, the defendants have established that they not only qualify under the 1344(f)(1)

exemption, but they do not come within the ensnaring "recapture" provision of Section

1344(f)(2).  *See, e.g., June v. Town of Westfield, New York*, 370 F.3d at 255 (Dirt, gravel,

sand, rock and cement used to shore up a road, near a tributary was not prohibited).

Even if the Section 1344(f)(1) exemption is narrowly construed, here the dredging

activity was conducted in a reasonable manner, for a valid community health purpose.  In

doing so, the Vector Control people acted responsibly in carrying out their assigned tasks.

*See Sargent II*, 876 F. Supp. at 1098.  Accordingly, the Court finds that the plaintiffs failed

to establish that the defendants discharged dredge and/or fill material into waters of the

United States in violation of the Clean Water Act.

J.      **As to the Plaintiffs' Claim That the Defendants Have Discharged Fecal Coliform Into Waters of the United States In Violation of the Clean Water Act**

Fecal Coliform is a "biological material" and is a "pollutant" under the CWA.  *See*

33 U.S.C. § 1362(6) and 33 U.S.C. § 1314(a)(4) ("pollutants classified as . . . fecal

coliform").  However, fecal coliform bacteria is a natural byproduct of animal feces and is

not a chemical invasion, a fact conceded by McAllister.

Q      Sir, you spoke on your direct exam about something called fecal coliform bacteria?

A      Yes.

Q      And let's be perfectly frank, here, what fecal coliform bacteria is. It's a by-product of animal poop?

A        Yes.  Scat. Waste.

Q        That occurs in the wild?

A        Yes, correct.

Q        Those wild areas include the marshlands in Suffolk County, correct?

A        Yes.

Q        And there's no specific area designated as a toilet area in the marshlands for the animals to relieve themselves in, correct?

A        Yes.

Q        So there is nothing that points to a ditch and that says "animals relieve yourself here" or anywhere else in the marshlands, correct?

A        Yes.

Q        Because animals excrete whatever they have to excrete whenever they want, correct?

A        Yes.

Q        Sir, isn't it true if you were to pick up the feces from a goose right outside of the courthouse, or any bird excrement that hit your car, that would contain fecal coliform bacteria, right?

A        Yes.

Q        So there is nothing chemical about fecal coliform bacteria.  It's a result of the natural process of excreting feces, correct?

A        Yes.

Tr. at 117-118.

The County of Suffolk has maintained this grid ditch system for mosquito control in certain areas of the County.  The ditches are of long standing.  There is no credible

evidence that the County created any "new" ditches. The Court has determined that the efforts by Vector Control to remove accumulated silt and foliage in the pre-existing grid ditch system is not prohibited by any statute and does not require a permit. As stated above, the provisions of 33 U.S.C. § 1344(f)(1) are clear and determinative and the case law supports this finding.

In addition to this 33 U.S.C. § 1344(f)(1) exemption to permit County maintenance of its seventy year old mosquito control grid ditch network, the County also contends that its actions are covered by the Army Corps Nationwide Permit 3. These "Nationwide Permits" are intended to assist municipalities in coping with multiple permit requirements from various municipalities. Army Corps of Engineers Nationwide Permit 3 demonstrates compliance with Clean Water Act Section 404 permit requirements.

Based on these statutory regulations and decisional determinations, the Court finds that the maintenance activities by the County on the mosquito grid ditch system, including the movement of the silt and sediment into the wetlands, are supported by Army Corps of Engineers Nationwide Permit 3 (*see also* the written opinion by New York State DEC [Defendants' Exh. FP] stating that "no additional permit is necessary for this ditch maintenance work).

Further, the Court finds that the plaintiffs have failed to show that the presence of fecal coliform bacteria was elevated due to the presence of the ditches or the maintenance work in support of the ditch grid network. In addition, the plaintiffs have failed to show any "point source" from which fecal coliform bacteria was discharged into the waters of the

United States.

## IV.  CONCLUSIONS

After reviewing the evidence, the statutes and regulations, and the applicable law and cases, the Court makes the following conclusions:

1.      Any discharge of adulticides into the waters of the United States by Vector Control trucks, airplane or helicopter is not a violation of the Clean Water Act;

2.      No additional permits are required for aerial adulticiding by Vector Control;

3.      The plaintiffs failed to prove that Vector Control did not apply the adulticides consistent with label instructions.  On the contrary, the Court finds that Vector Control does apply the adulticides, by truck, airplane and helicopter, in accordance with the respective label instructions;

4.      The discharge of dredge materials into the tidal wetlands, as a result of draining ditch maintenance is permissible under the Section 1344(f)(1) exemption; it is covered by the Army Corps of Engineers Nationwide Permit 3; and it does not require any additional permit;

5.      The spraying of adulticides and the dredging of the grid ditch system, as done previously and presently, is not a violation of the Clean Water Act and requires no additional permits;

6.      The plaintiffs failed to prove that any action by Vector Control in the maintenance of the grid ditch system caused the discharge of fecal coliform into the navigable waters of the United States in violation of the Clean Water Act.

In closing the Court again takes note of the language in the Emergency Authorization, dated August 23, 2005 (Defendants' Exh. FN) that "there is currently an immediate threat to human health due to the presence of West Nile Virus." The legally permissible spraying in this case, in this area of Suffolk County, is a permissible response to that continuing threat.

Accordingly, the complaint of the plaintiffs, with regard to all causes of action, is dismissed.

The Clerk of the Court is directed to enter judgment in favor of the defendants dismissing the complaint in its entirety and to close the case.


**SO ORDERED.**

Dated: November 17, 2008
      Central Islip, New York


                         */s/ Arthur D. Spatt*
                         ARTHUR D. SPATT
                         United States District Judge